OPINION OF THE COURT
Alan J. Saks, J.
This is a nonpayment summary proceeding. It was last on the calendar for trial on April 22, 1982. There is no dispute that tenant has not paid the agreed rent since September, 1981. The rent is $450 per month. Including June, arrears are now for nine months ($4,050). The only controversy is as to the tenant’s counterclaim for breach by the landlord of a covenant in the lease of the premises, a Chinese restaurant, to the effect that the landlord shall not permit a competing business in another part of the same building. When this case last appeared on the Trial Calendar (April 22, 1982), settlement discussions not involving me as the court were conducted. It was then reported to me by counsel for both sides as follows:
The competing business is essentially a retail fish store. The tenant herein has no objection to that business as such. What it objects to is that the fish store, Marty’s Sea *1036 Food, also has a take-out counter for sales of: fish sandwiches, fish and chips baskets and orders of chips only. (Soda pop is also sold on a take-out basis, but tenant has withdrawn its objection thereto.) The court was shown the tenant restaurant’s menu and photographs of the price list posted at the take-out counter of the fish store. A comparison of the two reveals that: there is no culinary similarity between the types of fast food orders sold at the take-out counter and the Chinese dishes sold at the restaurant; a meal at the restaurant that would be sufficient to satisfy the normal hunger of someone seeking a full meal would cost far more than the type of take-out repast offered at the fish store. The restaurant is of the sit-down type, with a relatively lavishly designed menu and prices to match, far above those at the take-out counter.
Nonetheless there was no serious dispute that the sales of take-out orders were at least technically violative of the noncompeting clause in the tenant’s lease. (The competing tenant is not a party and, in any event, this court lacks injunctive power.) The only issue as to which the parties were in dispute was the admissibility of evidence as to proof of the tenant’s damages, if it be assumed hypothetically that the noncompeting clause has been breached. Tenant’s counsel took the position that its damages could be predicated upon producing evidence as to the gross sales of the competing food items at the take-out counter and that, having established such gross amount, the court could draw the inference that every dollar spent on those items represented a loss of sales at the tenant restaurant. (Presumably, although this was not made clear, the tenant would then proceed to prove what its net profit would have been on said gross sales, had they been made at the restaurant and not at the fish store take-out counter. However, this was not made explicit and if the tenant suggests that it can prove damages by gross sales alone, whether by increase thereof at the fish store or decrease at its restaurant, it is clearly in error.) The tenant’s intended method of proving gross sales of the controversial items at the fish store is to extrapolate from the latter’s sales taxes, since the only items sold there that are subject to sales tax are the cooked, take-out ones.
*1037 In lieu of beginning a trial on April 22 last, the parties stipulated to have me make a pretrial evidentiary ruling as to whether tenant could base its proof of damages on the receipts of the competing business, which is apparently not" that of the landlord in any way.
It was further stipulated that the petition would be deemed amended to include a demand for rent as it continues to fall due and that the court shall set a new date for trial after it rules on the submitted issue.
DISCUSSION
This is not a case in which the initial lessor signed a noncompeting covenant and then turned around and rented to a competing business. Both the present landlord and the present tenant are successors to those who entered into the covenant, which was created in a lease entered into in 1972 between Anne Klein, landlord, and Margara Restaurant Corp., tenant. That lease was for 15 years. The present tenant was assigned tenant’s rights and assumed tenant’s duties thereunder on February 27, 1981, from an intermediate tenant, Crown Restaurant, Inc. When the present landlord acquired the building in question is not shown precisely, but it appears to have been sometime between the February 27, 1981 assignment to the tenant respondent and October, 1981, the first month for which rent is sought in the present eviction proceeding. The tenant claims that the illegal sales at the fish store began in June, 1981.
Tenant’s assertion, that it can prove its damages under the covenant by inference based on the sales at the takeout counter, raises a novel issue. In no case known to this court has it been so held. The only reported case in which the issue was even raised in the context of a landlord permitting competition by -a cotenant was Friedman v Celfan Bldg. Corp. (13 Misc 2d 192). There, the tenant sued the landlord to enjoin it to cause the competitor to discontinue the prohibited sales, or, alternatively, to recover as damages the profits made by the competitor on such sales. During the litigation, the landlord demanded a bill of particulars that included, inter alia, the amounts of allegedly prohibited sales (of soda pop) by the competitor. When *1038 the tenant failed to comply, the defendant landlord moved to preclude. The court excused the tenant’s failure to answer this demand on the basis that he lacked knowledge sufficient to so answer. However, this decision cannot be read as an authoritative determination as to the admissibility at trial of evidence of the amount of competing sales. Indeed, it states explicitly (13 Mise 2d, at p 195): “Whether the plaintiff can on the trial successfully show that the profits realized from the sale of bottled soda in the competing grocery store constituted a direct loss of profits to the plaintiff’s business will be a matter for determination by the trial court.”
Also inapposite, but for different reasons, is the sole case cited by the tenant herein, Y.J.D. Rest. Supply Co. v Dib (98 Misc 2d 462 [Grossman, J.]). That was not a landlord-tenant case at all. Rather, it was a suit in equity, the primary relief sought having been a permanent injunction. The defendant had sold his original business to plaintiff and had given a three-year covenant not to compete within a five-block radius. In total bad faith defendant proceeded to open within the prohibited time and area an apparently directly competing business, which cost him $214,500 to open and operate and which he subsequently sold for $250,000, thus realizing a $35,500 profit on the sale. Although plaintiff was unable to prove his own loss of profits, the court allowed him to recapture the said $35,500. The theory of that award was that since the defendant had sold his good will to plaintiff, by breaching the covenant he was in effect selling his good will twice, once to plaintiff and once to the purchaser of the competing business. Moreover, since the competing business could continue to operate and deprive plaintiff of profit (apparently, the purchaser thereof was found not to be bound by the covenant), the court in effect substituted the plaintiff for the defendant as the person entitled to the profit on the sale of the good will that plaintiff owned, because he had previously purchased it from defendant.
The instant case presents far different legal and factual context. While the Landlord-Tenant Part may be guided by equitable considerations, it is a part of a civil court that does not have general jurisdiction in equity. That general *1039 jurisdiction resides solely in the Supreme Court and enables the latter to devise a remedy for almost every cognizable legal wrong. Factually, the instant case is different from Y.J.D. Rest, (supra) for a multitude of reasons, including: the absence of willful misconduct, the dissimilarity in prices, the dissimilarity in cuisine, the different modes of eating (one being of the quick, “one-armed” type either on the street or at home, and the other being generally of the type where one sits down for a considerable time while being served although the restaurant does some take-out business too). It is simply not logical to assume that anyone willing to buy some fried fish for $1.50 or $2.50 also has a taste for Chinese food and would accept as a substitute sitting down for an hour or so to buy the same monetary amount of food (but for less in quantity) including the tip he or she would pay there.
LANDLORD-TENANT CASES
There was once a belief that the only measure of the tenant’s damages in these situations was the extent to which the value of tenant’s leasehold was reduced and that such reduction could only be proved by expert testimony. However, sinee Humphrey v Trustees of Columbia Univ. in City of N. Y. (228 App Div 168), it has been clear that the tenant’s loss of profits as a result of the competition may be awarded under certain circumstances. The rule is now stated in volume 33 of New York Jurisprudence (Landlord and Tenant, § 94, p 401): “Loss of profits may be recovered where the evidence is direct and certain, and where the income of the [tenant’s] business is not speculative because it has just started or for other reasons.”
Similarly, Rasch (New York Landlord and Tenant Summary Proceedings [2d ed, 1971], § 504) states: “[I]f the tenant fails to establish that competition results in either a loss of profits or a reduction in rental value, he is not entitled to any damages.”
In Humphrey (supra), the tenant was supposed to have the exclusive right to operate a cafeteria and restaurant in the six-store building. Within about a month after he *1040 leased his store, the landlord leased one of the nearby stores in the building to a delicatessen.*
The trouble was that the delicatessen added a lunch counter that sold a wide variety of cooked ready-to-eat meals. The landlord conceded at trial that the lunch counter violated the covenant and that it was liable for the breach, so the sole question was the quantum of damages. The trial court did not allow plaintiff to show that: on the days the delicatessen was closed and he was open his sales increased substantially, along with his net profits thereon. He was even prepared to prove, in great detail, that nothing else could have accounted for the fluctuation in sales, and he was prepared to prove in detail how much profit he would have made on the sales that he inferred were lost to his own business on the days both establishments were open. The trial court barred him from proving the foregoing, but the Appellate Division reversed, holding that this was precisely the kind of proof that would dispense with the need for general expert testimony as to leasehold value reduction; that such proof makes a prima facie case of certain and direct loss of business.
It further appears to be permissible to assert the breach of a noncompeting covenant as a counterclaim in a nonpayment summary proceeding. (See Kennedy v Abarno, 277 App Div 883; Supreme Fin. Corp. v Burnee Corp., 146 Misc 374 [App Term, 1st Dept].) Caveat, however, both of these cases resulted in landlord victories on the ground that proof of the tenant’s loss of profits was insufficient. In Kennedy, which involved sales of ice cream by the competitor, the Appellate Division said: “There is no basis in this record for the award made. There is no proof as to the proportion the tenant’s ice cream sales bore to his total sales, or whether the tenant’s total net profit from sales in all departments of his store decreased after the breach. Nor is there any basis in this record for a determination of the tenant’s claimed loss of net profits in sales of ice cream as the result of the breach of covenant.”
Supreme Fin. (supra) stresses that a tenant who proves merely loss of business but not loss of net profits may *1041 recover only nominal damages. (Contrast Rasch, op. cit., which says that he recovers no damages.)
After loss of profits became an authorized mode of proving damages, some authorities seemed to consider it merely another way of showing a decrease in the value of the leasehold, the other way being expert testimony. (Supreme Fin. Corp. v Burnee Corp., supra; Parker v Levin, 285 Mass 125.) However, the better view, in my opinion, is that loss of profits is not merely a subsidiary method of proving decrease in leasehold value but has an existence of its own. The distinction between the two views could be significant, because there may be cases where leasehold value increases notwithstanding a transient decrease in profits, or vice versa. The former situation could arise when the tenant suffers a loss in net profit because of the competition but could assign or sublet at a higher rental to someone who could take advantage of increased traffic in the area brought in by the formerly competing business. The reverse situation is a more common one. There, a tenant who for some reason cannot show a loss of profits is nonetheless permitted to prove the decrease in leasehold value by expert testimony. (See, e.g., Fairview Hardware v Strausman, 9 AD2d 944; Ripley Mfg. Corp. v Roosevelt Field, 18 AD2d 924.)
COMMONSENSE APPROACH
There may be cases in which it would be logical to infer that substantially every dollar spent at the competitor is a dollar lost by the aggrieved tenant. Whether such is the case is essentially a question of common sense. If it does not make common sense to draw that inference, doing so would violate the rule that loss of profits must be proved with reasonable certainty. The commonsense approach was approved recently in Borne Chem. Co. v Dictrow (85 AD2d 646). Thus, as held there, if the tenant does show a decrease in his net profits during the period of unlawful competition, a rebuttable presumption arises that the competition was the cause of the decrease, so that it is not necessary for the tenant to negate other possible causes.
Obviously, it would not make commonsense logic to infer that every sale made by a technically illegal competitor may be viewed as a loss of sale by an aggrieved tenant. *1042 Were that so, a high-priced French restaurant like La Lutece could base its allegedly lost profits on sales made at a hot dog stand. While the instant case does not present such an extreme situation, the dissimilarities between the two food establishments are such as to negate any one-for-one inference. If the competitor were a similar Chinese restaurant, or even a Chinese fast food operation, perhaps that inference could have been made.
COMMENT
Counsel for the tenant advised the court, on April 22, 1982, that it will be unable to prove its counterclaim unless it is permitted to do so on counsel’s theory that every sale of fast food represents a loss of sale at the restaurant. In a memorandum since submitted, counsel states that it would be unfair to require his client to prove direct loss of profit, because the restaurant was only started in February, 1981 and the competing sales of fast food began in June, 1981, implying that the restaurant was still building its business to its normal level when the competition began. Counsel for the tenant also advised on April 22, 1982 that it would attempt to take an immediate appeal if I ruled preliminarily against his proposed method of proof. While the court cannot control counsel’s course, it perceives no proper basis for staying the trial of this proceeding, which is supposed to be summary, pending an appeal. If counsel feels the court is in error on this ruling, the proper course would seem to be an appeal from judgment after trial, on which appeal this interlocutory ruling could be put in issue.
Furthermore, in addition to ruling it impermissible, the court does not agree that the proposed method is the only feasible one for proving damages in this case. One alternative would be expert testimony as to the decrease in the value of the leasehold, that is, testimony by one familiar with rental values in the area to the effect that the market rental value of the tenant’s restaurant is reduced by X dollars per month by the presence of the take-out counter.
Another alternative that could be considered is a method based on fluctuations in sales on days when the fish store is closed. (Cf. Humphrey v Trustees of Columbia Univ. in City of N. Y., 228 App Div 168, supra.) For instance, if it could *1043 be shown that, as is normally the case, the restaurant is open on Sunday but the fish store is closed, it might also be possible to show that before the competition began restaurant sales Monday through Saturday represented a certain proportion of restaurant sales on Sunday, but since the competition began Monday through Saturday sales have represented a lesser proportion of Sunday sales. Then, it would make common sense to infer that, but for the Monday through Saturday competition, the Monday through Saturday restaurant sales would have been a certain fraction higher than they were. Purely hypothetically, if precompetition weekday sales were 70% of Sunday sales but the proportion decreased to 60% postcompetition, one could infer that there was a 1/6 loss in weekday sales postcompetition. The dollar value of that 1/6 loss of sales could be computed if the total of postcompetition weekday sales was known. The tenant would then have to complete the picture by showing what its net profit would have been on the lost sales.
The clerk is directed to restore this case for trial in the Landlord-Tenant Part and to order the services of a Chinese interpreter.

 This was apparently a “delicatessen” in the old-fashioned sense of the word, that is, a general purpose food store, as distinguished from a combination food store and restaurant.