Rachel **RODRIGUEZ**, et al.,
Plaintiffs-Appellees,

v.

**VIA METROPOLITAN TRANSIT SYSTEM**, et al., Defendants-Appellants.

No. 85–2672.

United States Court of Appeals,
Fifth Circuit.

Oct. 10, 1986.

Judith R. Blakeway, Matthews & Branscomb, John R. Pinckney, III, Mark S. Helmke, San Antonio, Tex., for defendants-appellants.

Bill McKee, Brendan E. Gill, Bexar County Legal Aid Ass'n, San Antonio, Tex., for plaintiffs-appellees.

Before WISDOM, DAVIS, and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

VIA, San Antonio's metropolitan transit authority, and two of its officers challenge the district court's order specifically enforcing a 1978 agreement VIA had entered into to settle an action on behalf of handicapped residents seeking transportation services adapted to their needs. We AFFIRM the district court's finding that the agreement is enforceable but REMAND the case for further consideration of the manner in which the agreement is to be implemented.

Rachel Rodriguez, a plaintiff in the earlier suit and a signatory to the 1978 settlement agreement, filed the instant lawsuit

in state court in 1983. VIA removed the case to the federal district court, where it was amended to add several new plaintiffs and class action allegations. The amended action alleges violations of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Section 121.003 of the Texas Human Resources Code, the federal and state constitutions and breach of the 1978 settlement agreement.[1] The district court certified the class with named plaintiffs as its representatives and decided the class action on contractual grounds, without reaching the federal or state constitutional or statutory questions. After a three-day bench trial, the district court found that the defendants had violated the settlement agreement and ordered specific enforcement of the three provisions that are the subject of this appeal.

■ In its pleadings and at trial, VIA's position was that it had complied with the terms of the agreement and had acted within the framework of the relevant statutory and regulatory directives. Adopting an additional strategy on appeal, VIA launches a broad scale attack on the validity of the agreement itself, and the district court's construction of the agreement. VIA contends that (1) the agreement was not a contract but merely a non-binding statement of policy, and (2) even if the agreement is construed to be a contract, it cannot or should not be enforced.[2] Ordinarily an appellate court will not consider issues not raised in the trial court, unless, *inter alia,* the issues can be resolved as a matter of law, and a refusal to consider it would result in a miscarriage of justice. *See Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1117 n. 20 (5th Cir.1985). Our review of the validity and enforceability of the

agreement is appropriate under this exception to the general rule.

1. *Formation of the Agreement.*

■ The 1978 agreement was filed with the court in which the class action was pending, but was not incorporated into a formal consent decree. Nonetheless, settlement agreements, when fairly arrived at and properly entered into, are generally viewed as binding, final and as conclusive of the rights of the parties as is a judgment entered by the court. *Thomas v. Louisiana,* 534 F.2d 613, (5th Cir.1976); *Cia. Anon. Venezolana de Navegacion v. Harris,* 374 F.2d 33 (5th Cir.1967). Preliminarily, we note that VIA acknowledges that the settlement agreement fully and completely resolved the matters that gave rise to the earlier class action. The agreement recites that it was being adopted in order to comply with applicable statutory and regulatory requirements relating to transportation services for the elderly and handicapped. *See* Urban Mass Transportation Act of 1964 ("UMTA"); Section 504 of the Rehabilitation Act of 1973 29 U.S.C. § 794 (1976). The federal regulations in effect then and at the time of the instant action required transit authority recipients under UMTA to make "special efforts" in planning services and facilities that can be effectively used by the elderly and handicapped. *See* 49 U.S.C. § 1612(a); 49 C.F.R. § 609.15 (1976); 49 C.F.R. § 609.204 (1975); 41 Fed.Reg. 18,324 (1976); 23 C.F.R. § 450.120(a)(5) (1976); 46 Fed.Reg. 37,488 (1981), codified at 49 C.F.R. § 27.77 (1985).[3] For discussion of the regulatory history of § 504 and related acts and regulations, *see Dopico v. Goldschmidt,* 687 F.2d 644, 646–648 (2d Cir.1982) and *Lloyd v. Illinois Re-*

---

1. Several plaintiffs also sued individually, because they had been administratively terminated from using the handicapped transit system. Only one of these suits, that of Rachel Rodriguez, is relevant to this appeal. *See* Section ——, *infra.*

2. Although the factual genesis of this argument surfaced intermittently at trial and was amplified in VIA's unsuccessful motion for new trial or, in the alternative, for amendment of the

judgment, its legal implications were not fully developed until VIA's appellate briefs and oral argument.

3. The "special efforts" requirement was superseded on May 23, 1986, when the Department of Transportation adopted final regulations establishing minimum criteria for the provision of transportation services to handicapped and elderly individuals. 51 Fed.Reg. 18,994.

*gional Transportation Authority,* 548 F.Supp. 575 (N.D.Ill.1982).

■ The manner in which San Antonio's transit authority chose to meet § 504's "special efforts" requirement was reached after extensive negotiations with the original plaintiffs and the parties' compromise was embodied in the 13 provisions of the agreement. In the years following the settlement, VIA developed a paratransit system modelled directly on those provisions. For example, VIA inaugurated a paratransit service, VIA Trans; acquired a fleet of vans and contracted with a taxicab company to supplement its paratransit fleet; established schedules and routes; created an advisory committee; and established guidelines for VIA's personnel in their dealings with the handicapped. In short, VIA set about implementing the very procedures and measures contemplated when it signed the agreement. The establishment of a separate paratransit system spared VIA from the considerably more expensive alternative of retrofitting its mainline buses to make them wheelchair accessible. In exchange, the class plaintiffs gave up a claim for mainline accessibility, plausible under the federal law and cases then controlling, for assurances of a smaller fleet providing curb-to-curb accessibility. Absent fraud, deception, coercion or overreaching, a valid settlement agreement may not be repudiated. *Strange v. Gulf & Southern American Steamship Co.,* 495 F.2d 1235 (5th Cir.1974). VIA makes no such allegation. We conclude, based upon the terms of the agreement and VIA's subsequent conduct, reinforced by VIA's consistent testimony at trial that it believed it was in compliance with the agreement, that in settling the earlier action VIA was entering into a contractual obligation and not just adopting a nonbinding statement of policy.

## 2. Violation of the Agreement.

We turn now to the three provisions in issue and the order of the court specifically

enforcing them. The provisions require VIA to

 1. diligently prosecute applications to the Department of Transportation for capital grants for the acquisition and maintenance of a fleet of 25 lift equipped vans for paratransit service;

 2. provide paratransit service upon no more than two hours notification, except during peak demand periods; and

 3. as soon as the vans became available, undertake a six month experiment running two or three of the vans on a route between shopping malls.

The district court, after reviewing the evidence, concluded that provision (1) required VIA to "maintain and operate" the 25 van fleet between 6:00 A.M. and 11:00 P.M., seven days a week. With regard to provision (2) the court found that VIA had failed to provide service on two hours' notice, and that riders routinely had to call seven days in advance for service. The court, however, found that enforcing the two hour service provision was neither feasible nor practical. The court, therefore, modified the provision to require VIA to provide demand-response service on no more than 24 hours' notice.[4] With regard to provision (3) the court found that VIA had not undertaken the experiment and ordered immediate compliance.

With regard to provision (1) above, the following facts were uncontroverted: VIA Trans applied for and obtained capital grants sufficient to purchase 25 vans; 25 vans were purchased and used; in 1983, VIA had sold or solicited to sell several of its vans; in 1984, VIA had a fleet of 20 vans, 14 of which were committed to peak hour service; in 1985, between 6 and 15 vans were in service at one time; hours of operation are 6:00 a.m. to 11:00 p.m., seven days a week; eligibility is determined on a first-come, first-served basis; limited subscription service is available for regularly recurring trips.

---

**4.** The minimum criteria adopted in 1986 require, *inter alia,* that public transit authorities operating paratransit systems provide services

within 24 hours of the individual's request. 51 Fed.Reg. at 19,020, amending 49 C.F.R. § 27.-95(b)(2).

With regard to provision (2) above, although the testimony was conflicting, it indicated that, with rare exceptions, riders were required to call seven days in advance to succeed in reserving a ride. With regard to provision (3) above, VIA admitted that it had not instituted the experiment but contended that this violation was excused because the advisory committee, composed of class plaintiffs, had voted against the experiment. The district court rejected the excuse because one member of the advisory committee testified that his negative vote was prompted by VIA's representations that the experiment would cause further depletion of the six to fifteen vans being used for regular service.

Were our inquiry to end here, we would conclude that the court's findings of violation had ample support as the record had been developed by the parties up to and including trial. After judgment was entered, however, VIA moved for a new trial and/or for alteration or amendment of the judgment. Attached to the motion was an affidavit, by Wayne Cook, chief executive officer of VIA and a signatory to the 1978 agreement. Cook's affidavit was replete with data, some of them new, allegedly demonstrating the harmful effects the court's specific enforcement order would work on the transit authority, the city fisc, and the class plaintiffs. The district court denied the motion without an evidentiary hearing. On appeal, VIA reurges these data and based on the data, makes the following argument.

*3. Enforcement of the agreement.*

■ VIA contends that if the agreement is a contract, it may not be specifically enforced because, as construed by the court, (1) the agreement is vague, (2) specific performance would be unduly harsh and oppressive, (3) the agreement is contrary to public policy, and (4) specific performance will require constant supervision by the court. We hold, as a matter of law, that the agreement itself is susceptible of specific performance. We find that the agreement is not so vague that it cannot be specifically enforced. The standard is one of reasonable certainty. *Condovest Corp. v. John Street Builders*, 662 S.W.2d 138, 140 (Tex.App.—Austin 1983, no writ); *Lloyd v. Holland*, 659 S.W.2d 103 (Tex. App.—Houston [14th Dist.] 1983, no writ); *Madariaga v. Morris*, 639 S.W.2d 709 (Tex. App.—Tyler 1982, writ ref'd n.r.e.). That the parties proffer different interpretations as to their obligations under a contract does not mean that their dispute is unreasonable or the contract is unworkable. VIA contended at trial that it was in compliance. Subsumed in that argument is an understanding, perhaps mistaken, of what its obligations under the agreement are. Further, in adopting the agreement here, the parties were not formalizing a *fait accompli*. Rather they were embarking upon a new venture, whose course was charted by an agreement embodying what both parties believed were feasible means of achieving their mutual objective. VIA's impressive achievements in providing transportation services to the handicapped under the agreement underscores our conclusion that the standards of reasonable certainty have been satisfied.[5]

Enforcement of the agreement need not, as VIA contends, result in harsh and oppressive consequences. The district court's modification of the two hours' notice requirement is a laudable example of striking a sensible balance between the legitimate needs of the class and the resources available to VIA. This modification also disposes of VIA's public policy challenge to the enforceability of the agreement. It is settled under Texas law that a governmental agency cannot contract in such a way as to lose control over its governmental operations. *See, e.g., City of Farmers Branch v. City of Addison*, 694 S.W.2d 94, 95 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Fidelity Land & Trust Co. of Texas v. City of West University Place*, 496 S.W.2d 116, 118 (Tex.Civ.App.—Houston [14th Dist.]

---

5. In 1984, VIA Trans provided more than 91,000 trips, approximately two-thirds of which were taken in the vans, the remaining one-third in taxis.

1973, writ ref'd n.r.e.). Significantly, VIA does not maintain that entering into the agreement was an *ultra vires* act. VIA, which was created under Tex.Rev.Civ.Stat. Ann. art. 1118x (Vernon Supp.1986), is authorized to make contracts and agreements with, *inter alia*, private corporations and "any other persons." *Id.* § 6(1). Instead, VIA maintains that the enforcement order impermissibly construes the agreement so as to deprive it of the exercise of the discretionary authority granted to it by statute. The modification of the two hours' advance notice provision, however, illustrates that VIA has neither surrendered to the class plaintiffs veto power over the manner in which the transit system is to be regulated nor rigidly bound itself to an unworkable agreement.

■ Although we conclude that the agreement is amenable to specific performance, we do find merit in the concerns expressed by VIA regarding what it *must* do, as well as what it *can* do, to comply with the court's order. For example, VIA contends that the uncertainty surrounding its obligations may lead to continued trips to the courthouse, needlessly involving the court in a myriad of operational decisions. For example, in its order, the court directed VIA to "maintain and operate ... twenty-five vans between 6:00 a.m. and 11:00 p.m. seven days a week." As VIA points out, the order can be interpreted to mean that VIA is required to have 25 vans in actual operation during those hours which, VIA contends, would necessitate acquiring at least 10 more vans. Cook's affidavit alleges that the annual cost of implementing this degree of service would more than triple VIA's present expenditures.[6] Because present demands for service on weekday evenings and weekends seldom require more than eight vans, even with an optimistic increase of 33% in ridership, more than half the van fleet would be idle

during these periods, resulting in wasteful expenditure of the already increased equipment and labor costs. If the order does not require that 25 vans be in actual operation, but requires that the 25 vans be either in use or undergoing maintenance during the 17 hours each day required by the order, the overall cost would drop by about 5%. If the 25 van requirement is interpreted as meaning that VIA must purchase 25 vans and operate them according to the customary demand pattern, compliance would require from 10 vans at base periods to 21 at peak periods, costing an additional 28% of VIA Trans' current annual operating budget. The increased cost indicated by any of these interpretations, according to the affidavit, would adversely impact the amounts available for taxi service.[7] The affidavit contains a similar analysis regarding the implementation of provisions (2) and (3), confirming that varied interpretations are possible regarding the hours of service, schedules and routes as well as their respective attendant costs and benefits.

We do not agree with class plaintiffs that the questions raised by Cook's affidavit are purely speculative nor are we as confident as they that VIA will not be running the risk of being in violation of the court's order, as it now stands, if it employs as much of the 25 van fleet as is not undergoing maintenance to meet the 24 hours' notice response requirement. The district court's ruling on a motion for a new trial, however, will not be disturbed unless there has been abuse of discretion. *Dixon v. Internat'l Harvester Co.*, 754 F.2d 573, 586 (5th Cir.1985). The remedy of specific performance is equitable in nature, and a court may properly examine whether, because of changes in circumstances, granting the relief will result in inequity or violate the intent and purpose of the agreement. *Standard Oil Co. of Texas v. Lope-*

---

6. Cook testified that expenditures for VIA Trans exceeded § 504's requirements for the three fiscal years preceding the trial, and by 1985 was three times the amount required.

7. Taxi service is already an important component of the VIA Trans operation. *See* n. 5, *supra.* Cook further avers that the combination of vans and taxis called for in the 1978 agreement proved wasteful, leading VIA to reduce the number of vans and double the taxi budget.

no Gas Co., 240 F.2d 504 (5th Cir.1957). We conclude that VIA's motion for new trial presented substantial reasons, including both additional facts concerning the management of an effective handicapped transit system and changed regulatory requirements, for reopening the judgment. Accordingly we remand the case to the district court to conduct a hearing on the matters raised by VIA's motion and consider whatever additional evidence may be necessary to resolve the issues raised in the motion.

The district court, on remand, should be guided by the usual criteria that govern a decree of specific performance in Texas. See, e.g. Horner v. Bourland, 724 F.2d 1142 (5th Cir.1984); Foust v. Hanson, 612 S.W.2d 251 (Tex.Civ.App.—Beaumont 1981, no writ); see generally 52 Tex.Jur.2d Specific Performance § 147 (1964). Specific performance, as an equitable remedy, should not lead the court to require a vain and useless act. We note that the new federal guidelines for transportation service to the handicapped, note 2 supra, may require VIA to provide more or significantly different, services than those contemplated by the settlement agreement, while in some respects, the regulations and settlement agreement appear to harmonize. Counsel for the class admitted during oral argument in this Court that the parties had not fully analyzed the interplay between the then-newly-promulgated regulations and the goals of this litigation. Thus, the court may choose to demur in the exercise of its equitable powers to the extent that the Department of Transportation, with presumably more expertise or with a direct regulatory impact on the concerns of this class, has set out pertinent criteria to be followed by VIA.

The court should also decline, in the context of enforcing this settlement agreement, to embark upon a continuing supervisory role over VIA Trans. A decree of specific performance should be readily enforceable and should not require long-continued court supervision. Lone Star Salt Co. v. Texas Short Line Ry., 90 S.W. 863, 865–66 (1906); Hubler v. Oshman, 700 S.W.2d 694 (Tex.App.—Corpus Christi 1985; no writ); American Housing Resources, Inc. v. Slaughter, 597 S.W.2d 13, 15 (Tex.Civ.App.—Dallas 1980). Eight years have passed since the parties' settlement agreement was signed. Because of changing government regulations and the proliferation of handicapped transportation services, both in number and technological variety, the just enforcement of the settlement agreement has become a moving target. The district court may not, consistent with its limited power to award specific performance, shoot at that target indefinitely. Consequently, whatever remedial decree is entered by the court on remand should be of limited duration.

■ The final matter in this appeal concerns the affirmation by the district court of VIA's termination of services for Rachel Rodriguez because of altercations with VIA Trans bus drivers. Rodriguez filed a notice of appeal simultaneously with a motion for extension of time to file a notice of appeal in the district court. This filing was three days after the running of the time for filing a cross-appeal but within the 30 days grace period. See Fed.R.App.P. 4(a)(3) and (5). The district court denied the extension motion. Our review of the record reveals that Rodriguez has not filed any appeal from the denial of the extension motion. Accordingly we are without jurisdiction to consider her cross appeal.

The judgment of the district court is AFFIRMED in Part, VACATED in Part, and Remanded for further proceedings.