**WALGREEN COMPANY,**
Plaintiff–Appellee,

v.

**SARA CREEK PROPERTY COMPANY,**
B.V., a/k/a Sara Creek Beta, and Phar–Mor Corporation, Defendants–Appellants.

**No. 91–3519.**

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1992.

Decided June 29, 1992.

Kevin J. Lyons (argued), Steven L. Nelson, Francis R. Croak, Cook & Franke, Milwaukee, Wis., for plaintiff-appellee.

Stephen J. Senderowitz (argued), Stephen E. Ray, John R. McLain, Richard M. Knoth, Randall L. Klein, Claire Toomey Durkin, Greenberger, Krauss & Tenenbaum, Chicago, Ill., for defendants-appellants.

Before POSNER and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal from the grant of a permanent injunction raises fundamental issues concerning the propriety of injunctive relief 775 F.Supp. 1192 (E.D.Wis.1991). The essential facts are simple. Walgreen has operated a pharmacy in the Southgate Mall in Milwaukee since its opening in 1951. Its current lease, signed in 1971 and carrying a 30–year, 6–month term, contains, as had the only previous lease, a clause in which the landlord, Sara Creek, promises not to lease space in the mall to anyone else who wants to operate a pharmacy or a store containing a pharmacy. Such an exclusivity clause, common in shopping-center leases, is occasionally challenged on antitrust grounds, Milton Handler & Daniel E. Lazaroff, "Restraint of Trade and the Restatement (Second) of Contracts," 57 N.Y.U.L.Rev. 669, 683–708 (1982); Note, "The Antitrust Implications of Restrictive Covenants in Shopping Center Leases," 86 Harv.L.Rev. 1201 (1973)—implausibly enough, given the competition among malls; but that is an issue for another day, since in this appeal Sara Creek does not press the objection it made below to the clause on antitrust grounds.

In 1990, fearful that its largest tenant—what in real estate parlance is called the "anchor tenant"—having gone broke was about to close its store, Sara Creek informed Walgreen that it intended to buy out the anchor tenant and install in its place a discount store operated by Phar–Mor Corporation, a "deep discount" chain, rather than, like Walgreen, just a "discount" chain. Phar–Mor's store would occupy 100,000 square feet, of which 12,000 would be occupied by a pharmacy the same size as Walgreen's. The entrances to the two stores would be within a couple of hundred feet of each other.

Walgreen filed this diversity suit for breach of contract against Sara Creek and Phar–Mor and asked for an injunction against Sara Creek's letting the anchor premises to Phar–Mor. After an evidentiary hearing, the judge found a breach of Walgreen's lease and entered a permanent injunction against Sara Creek's letting the anchor tenant premises to Phar–Mor until the expiration of Walgreen's lease. He did this over the defendants' objection that Walgreen had failed to show that its remedy at law—damages—for the breach of the exclusivity clause was inadequate. Sara Creek had put on an expert witness who testified that Walgreen's damages could be readily estimated, and Walgreen had countered with evidence from its employees that its damages would be very difficult to compute, among other reasons because they included intangibles such as loss of goodwill.

Sara Creek reminds us that damages are the norm in breach of contract as in other cases. Many breaches, it points out, are "efficient" in the sense that they allow resources to be moved into a more valuable use. Patton v. Mid–Continent Systems, Inc., 841 F.2d 742, 750–51 (7th Cir.1988). Perhaps this is one—the value of Phar–Mor's occupancy of the anchor premises may exceed the cost to Walgreen of facing increased competition. If so, society will be better off if Walgreen is paid its damages, equal to that cost, and Phar–Mor is allowed to move in rather than being kept out by an injunction. That is why injunctions are not granted as a matter of course, but only when the plaintiff's damages remedy is inadequate. Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 279 (7th Cir.1986). Walgreen's is not, Sara Creek argues; the projection of business losses due to increased competition is a routine exercise in calculation. Damages representing either the present value of lost future profits or (what should be the equivalent, Carusos v. Briarcliff, Inc., 76 Ga. App. 346, 351–52, 45 S.E.2d 802, 806–07

(1947)) the diminution in the value of the leasehold have either been awarded or deemed the proper remedy in a number of reported cases for breach of an exclusivity clause in a shopping-center lease. *Coach House of Ward Parkway, Inc. v. Ward Parkway Shops, Inc.,* 471 S.W.2d 464, 473 (Mo.1971); *Krikorian v. Dailey,* 171 Va. 16, 197 S.E. 442 (1938); *PNY Realty Corp. v. Chong Leung Restaurant,* 116 Misc.2d 1035, 457 N.Y.S.2d 358 (1982); *Saucier v. John–Clai Co.,* 408 So.2d 27 (La.App.1981); *Barr & Sons, Inc. v. Cherry Hill Center, Inc.,* 90 N.J.Super. 358, 376, 217 A.2d 631, 641 (1966); *Renee Cleaners, Inc. v. Good Deal Super Markets of N.J., Inc.,* 89 N.J.Super. 186, 214 A.2d 437 (App.Div. 1965); *Carusos v. Briarcliff, Inc., supra;* Annot., "Validity, Construction, and Effect of Lessor's Covenant Against Use of His Other Property in Competition with the Lessee–Covenantee," 97 A.L.R.2d 4, 111–117 (§ 28) (1964 and Supp.1983). Why, Sara Creek asks, should they not be adequate here?

Sara Creek makes a beguiling argument that contains much truth, but we do not think it should carry the day. For if, as just noted, damages have been awarded in some cases of breach of an exclusivity clause in a shopping-center lease, injunctions have been issued in others. *Handy Andy Home Improvement Centers, Inc. v. American National Bank & Trust Co.,* 177 Ill.App.3d 647, 126 Ill.Dec. 852, 532 N.E.2d 537 (1988); *De Koven Drug Co. v. First National Bank,* 27 Ill.App.3d 798, 800, 327 N.E.2d 378, 379 (1975); *Regis Corp. v. Fusco Corp.,* 496 So.2d 833, 835 (Fla.App.1986); *Belvin v. Sikes,* 2 So.2d 65 (La.App.1941); *Child World, Inc. v. South Towne Centre, Ltd.,* 634 F.Supp. 1121, 1134–35 (S.D.Ohio 1986). The choice between remedies requires a balancing of the costs and benefits of the alternatives. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944); *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944). The task of striking the balance is for the trial judge, subject to deferential appellate review in recognition of its particularistic, judgmental, fact-bound character. *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989). As we said in an appeal from a grant of a preliminary injunction—but the point is applicable to review of a permanent injunction as well— "The question for us [appellate judges] is whether the [district] judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes." *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 390 (7th Cir.1984).

■ The plaintiff who seeks an injunction has the burden of persuasion—damages are the norm, so the plaintiff must show why his case is abnormal. But when, as in this case, the issue is whether to grant a permanent injunction, not whether to grant a temporary one, the burden is to show that damages are inadequate, not that the denial of the injunction will work irreparable harm. "Irreparable" in the injunction context means not rectifiable by the entry of a final judgment. *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1393 (7th Cir.1992); *Vogel v. American Society of Appraisers,* 744 F.2d 598, 599 (7th Cir.1984). It has nothing to do with whether to grant a permanent injunction, which, in the usual case anyway, *is* the final judgment. The use of "irreparable harm" or "irreparable injury" as synonyms for inadequate remedy at law is a confusing usage. It should be avoided. Owen M. Fiss & Doug Rendleman, *Injunctions* 59 (2d ed. 1984).

■ The benefits of substituting an injunction for damages are twofold. First, it shifts the burden of determining the cost of the defendant's conduct from the court to the parties. If it is true that Walgreen's damages are smaller than the gain to Sara Creek from allowing a second pharmacy into the shopping mall, then there must be a price for dissolving the injunction that will make both parties better off. Thus, the effect of upholding the injunction would be to substitute for the costly processes of forensic fact determination the less costly processes of private negotiation. Second, a premise of our free-market system, and the lesson of experience here and

abroad as well, is that prices and costs are more accurately determined by the market than by government. A battle of experts is a less reliable method of determining the actual cost to Walgreen of facing new competition than negotiations between Walgreen and Sara Creek over the price at which Walgreen would feel adequately compensated for having to face that competition.

That is the benefit side of injunctive relief but there is a cost side as well. Many injunctions require continuing supervision by the court, and that is costly. *Roland Machinery Co. v. Dresser Industries, Inc., supra,* 749 F.2d at 391–92; *Rodriguez v. VIA Metropolitan Transit System,* 802 F.2d 126, 132 (5th Cir.1986); *Bethlehem Engineering Export Co. v. Christie,* 105 F.2d 933, 935 (2d Cir.1939) (L. Hand, J.). A request for specific performance (a form of mandatory injunction) of a franchise agreement was refused on this ground in *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.,* 583 F.Supp. 691, 699 (N.D.Ill.1984); see Edward Yorio, *Contract Enforcement: Specific Performance and Injunctions* § 3.3.2 (1989). This ground was also stressed in *Rental Development Corp. v. Lavery,* 304 F.2d 839, 841–42 (9th Cir.1962), a case involving a lease. Some injunctions are problematic because they impose costs on third parties. *Shondel v. McDermott,* 775 F.2d 859, 868 (7th Cir.1985). A more subtle cost of injunctive relief arises from the situation that economists call "bilateral monopoly," in which two parties can deal only with each other: the situation that an injunction creates. *Goldstick v. I.C.M. Realty,* 788 F.2d 456, 463 (7th Cir.1986); *Milbrew, Inc. v. Commissioner,* 710 F.2d 1302, 1306–07 (7th Cir.1983); *Chicago & North Western Transportation Co. v. United States,* 678 F.2d 665, 667 (7th Cir.1982). The sole seller of widgets selling to the sole buyer of that product would be an example. But so will be the situation confronting Walgreen and Sara Creek if the injunction is upheld. Walgreen can "sell" its injunctive right only to Sara Creek, and Sara Creek can "buy" Walgreen's surrender of its right to enjoin the leasing of the anchor tenant's

space to Phar–Mor only from Walgreen. The lack of alternatives in bilateral monopoly creates a bargaining range, and the costs of negotiating to a point within that range may be high. Suppose the cost to Walgreen of facing the competition of Phar–Mor at the Southgate Mall would be $1 million, and the benefit to Sara Creek of leasing to Phar–Mor would be $2 million. Then at any price between those figures for a waiver of Walgreen's injunctive right both parties would be better off, and we expect parties to bargain around a judicial assignment of legal rights if the assignment is inefficient. R.H. Coase, "The Problem of Social Cost," 3 *J. Law & Econ.* 1 (1960). But each of the parties would like to engross as much of the bargaining range as possible—Walgreen to press the price toward $2 million, Sara Creek to depress it toward $1 million. With so much at stake, both parties will have an incentive to devote substantial resources of time and money to the negotiation process. The process may even break down, if one or both parties want to create for future use a reputation as a hard bargainer; and if it does break down, the injunction will have brought about an inefficient result. All these are in one form or another costs of the injunctive process that can be avoided by substituting damages.

The costs and benefits of the damages remedy are the mirror of those of the injunctive remedy. The damages remedy avoids the cost of continuing supervision and third-party effects, and the cost of bilateral monopoly as well. It imposes costs of its own, however, in the form of diminished accuracy in the determination of value, on the one hand, and of the parties' expenditures on preparing and presenting evidence of damages, and the time of the court in evaluating the evidence, on the other.

The weighing up of all these costs and benefits is the analytical procedure that is or at least should be employed by a judge asked to enter a permanent injunction, with the understanding that if the balance is even the injunction should be withheld. The judge is not required to explicate every

detail of the analysis and he did not do so here, but as long we are satisfied that his approach is broadly consistent with a proper analysis we shall affirm; and we are satisfied here. The determination of Walgreen's damages would have been costly in forensic resources and inescapably inaccurate. *Roland Machinery Co. v. Dresser Industries, Inc., supra,* 749 F.2d at 386; *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986); *K–Mart Corp. v. Oriental Plaza, Inc., supra,* 875 F.2d at 914–16. The lease had ten years to run. So Walgreen would have had to project its sales revenues and costs over the next ten years, and then project the impact on those figures of Phar–Mor's competition, and then discount that impact to present value. All but the last step would have been fraught with uncertainty.

We may have given too little weight to such uncertainties in *American Dairy Queen Corp. v. Brown–Port Co.,* 621 F.2d 255, 257 n. 2 (7th Cir.1980), but in that case the district judge had found that the remedy at law was adequate in the circumstances and the movant had failed to make its best argument for inadequacy in the district court. *Id.* at 259. It is difficult to forecast the profitability of a retail store over a decade, let alone to assess the impact of a particular competitor on that profitability over that period. Of course one can hire an expert to make such predictions, Glen A. Stankee, "Econometric Forecasting of Lost Profits: Using High Technology to Compute Commercial Damages," 61 *Fla.B.J.* 83 (1987), and if injunctive relief is infeasible the expert's testimony may provide a tolerable basis for an award of damages. We cited cases in which damages have been awarded for the breach of an exclusivity clause in a shopping-center lease. But they are awarded in such circumstances not because anyone thinks them a clairvoyant forecast but because it is better to give a wronged person a crude remedy than none at all. It is the same theory on which damages are awarded for a disfiguring injury. No one thinks such injuries readily monetizable, *City of Panama,* 101 U.S. 453, 464, 25 L.Ed. 1061 (1880); *McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, 1557 (7th Cir.1987); Marcus L. Plant, "Damages for Pain and Suffering," 19 *Ohio St.L.J.* 200, 205–06 (1958), but a crude estimate is better than letting the wrongdoer get off scot-free (which, not incidentally, would encourage more such injuries). Randall R. Bovbjerg *et al.,* "Valuing Life and Limb in Tort: Scheduling 'Pain and Suffering,'" 83 *Nw.U.L.Rev.* 908 (1989). Sara Creek presented evidence of what happened (very little) to Walgreen when Phar–Mor moved into other shopping malls in which Walgreen has a pharmacy, and it was on the right track in putting in comparative evidence. But there was a serious question whether the other malls were actually comparable to the Southgate Mall, so we cannot conclude, in the face of the district judge's contrary conclusion, that the existence of comparative evidence dissolved the difficulties of computing damages in this case. Sara Creek complains that the judge refused to compel Walgreen to produce all the data that Sara Creek needed to demonstrate the feasibility of forecasting Walgreen's damages. Walgreen resisted, on grounds of the confidentiality of the data and the cost of producing the massive data that Sara Creek sought. Those are legitimate grounds; and the cost (broadly conceived) they expose of pretrial discovery, in turn presaging complexity at trial, is itself a cost of the damages remedy that injunctive relief saves.

Damages are not always costly to compute, or difficult to compute accurately. In the standard case of a seller's breach of a contract for the sale of goods where the buyer covers by purchasing the same product in the market, damages are readily calculable by subtracting the contract price from the market price and multiplying by the quantity specified in the contract. But this is not such a case and here damages would be a costly and inaccurate remedy; and on the other side of the balance some of the costs of an injunction are absent and the cost that is present seems low. The injunction here, like one enforcing a covenant not to compete (standardly enforced by injunction, Yorio, *supra,* 401–08), is a

simple negative injunction—Sara Creek is not to lease space in the Southgate Mall to Phar–Mor during the term of Walgreen's lease—and the costs of judicial supervision and enforcement should be negligible. There is no contention that the injunction will harm an *unrepresented* third party. It may harm Phar–Mor but that harm will be reflected in Sara Creek's offer to Walgreen to dissolve the injunction. (Anyway Phar–Mor *is* a party.) The injunction may also, it is true, harm potential customers of Phar–Mor—people who would prefer to shop at a deep-discount store than an ordinary discount store—but their preferences, too, are registered indirectly. The more business Phar–Mor would have, the more rent it will be willing to pay Sara Creek, and therefore the more Sara Creek will be willing to pay Walgreen to dissolve the injunction.

The only substantial cost of the injunction in this case is that it may set off a round of negotiations between the parties. In some cases, illustrated by *Boomer v. Atlantic Cement Co.*, 26 N.Y.2d 219, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970), this consideration alone would be enough to warrant the denial of injunctive relief. The defendant's factory was emitting cement dust that caused the plaintiffs harm monetized at less than $200,000, and the only way to abate the harm would have been to close down the factory, which had cost $45 million to build. An injunction against the nuisance could therefore have created a huge bargaining range (could, not would, because it is unclear what the current value of the factory was), and the costs of negotiating to a point within it might have been immense. If the market value of the factory was actually $45 million, the plaintiffs would be tempted to hold out for a price to dissolve the injunction in the tens of millions and the factory would be tempted to refuse to pay anything more than a few hundred thousand dollars. Negotiations would be unlikely to break down completely, given such a bargaining range, but they might well be protracted and costly. There is nothing so dramatic here. Sara Creek does not argue that it will have to close the mall if enjoined from leasing to Phar–Mor. Phar–Mor is not the only potential anchor tenant. *Liza Danielle, Inc. v. Jamko, Inc.*, 408 So.2d 735, 740 (Fla.App. 1982), on which Sara Creek relies, presented the converse case where the grant of the injunction would have forced an existing tenant to close its store. The size of the bargaining range was also a factor in the denial of injunctive relief in *Gitlitz v. Plankinton Building Properties, Inc.*, 228 Wis. 334, 339–40, 280 N.W. 415, 418 (1938).

To summarize, the judge did not exceed the bounds of reasonable judgment in concluding that the costs (including forgone benefits) of the damages remedy would exceed the costs (including forgone benefits) of an injunction. We need not consider whether, as intimated by Walgreen, exclusivity clauses in shopping-center leases should be considered presumptively enforceable by injunctions. Although we have described the choice between legal and equitable remedies as one for case-by-case determination, the courts have sometimes picked out categories of case in which injunctive relief is made the norm. The best-known example is specific performance of contracts for the sale of real property. *Anderson v. Onsager*, 155 Wis.2d 504, 455 N.W.2d 885 (1990); *Okaw Drainage District v. National Distillers & Chemical Corp.*, 882 F.2d 1241, 1248 (7th Cir.1989); Anthony T. Kronman, "Specific Performance," 45 *U.Chi.L.Rev.* 351, 355 and n. 20 (1978). The rule that specific performance will be ordered in such cases as a matter of course is a generalization of the considerations discussed above. Because of the absence of a fully liquid market in real property and the frequent presence of subjective values (many a homeowner, for example, would not sell his house for its market value), the calculation of damages is difficult; and since an order of specific performance to convey a piece of property does not create a continuing relation between the parties, the costs of supervision and enforcement if specific performance is ordered are slight. The exclusivity clause in Walgreen's lease relates to real estate, but we hesitate to suggest that every contract involving real estate should

be enforceable as a matter of course by injunctions. Suppose Sara Creek had covenanted to keep the entrance to Walgreen's store free of ice and snow, and breached the covenant. An injunction would require continuing supervision, and it would be easy enough if the injunction were denied for Walgreen to hire its own ice and snow remover and charge the cost to Sara Creek. Cf. *City of Michigan City v. Lake Air Corp.*, 459 N.E.2d 760 (Ind.App.1984). On the other hand, injunctions to enforce exclusivity clauses are quite likely to be justifiable by just the considerations present here—damages are difficult to estimate with any accuracy and the injunction is a one-shot remedy requiring no continuing judicial involvement. So there is an argument for making injunctive relief presumptively appropriate in such cases, but we need not decide in this case how strong an argument.

AFFIRMED.

HARLINGTON WOOD, Jr., Senior Circuit Judge, concurring.

I gladly join in the affirmance reached in Judge Posner's expert analysis.