DRAINAGE DISTRICT #1 IN SAND PRAIRIE TOWNSHIP, COUNTY OF TAZEWELL, Plaintiff-Appellee, *v.* THE VILLAGE OF GREEN VALLEY, Defendant-Appellant.

Third District   No. 78-381

Opinion filed March 23, 1979.

Arthur Kingery, of Strodel & Kingery, Associates, of Peoria, for appellant.

William H. Knuppel, of Lemmer, Boggs, Knuppel & Krebaum, P. C., of Havana, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from an order of the circuit court of Tazewell County granting an injunction preventing the village of Green Valley from discharging effluents into a ditch located in Drainage District #1 in Sand Prairie Township, Tazewell County, Illinois.

On February 4, 1977, the village of Green Valley (hereinafter known as Green Valley) filed an application with the Tazewell County Zoning Board of Appeals for a special use permit for the construction of a sewage treatment facility. Green Valley proposed to build the facility on a seven-acre tract located north of the village and in Drainage District #1 in Sand Prairie Township, Tazewell County, Illinois (hereinafter known as Drainage District). Effluents from the sewage treatment plant were to be discharged into a ditch owned by the Drainage District. After a public hearing the Zoning Board recommended that the special use permit be approved. On March 17, 1977, the Tazewell County Board approved the issuance of the permit.

On August 22, 1977, Green Valley purchased the seven-acre tract and began construction.

The Drainage District had been organized in 1903. The drainage ditch had been dug in 1904. Assessments were collected in 1904-06. In 1958, a report was filed by the treasurer of the district seeking to be relieved of the funds on hand. There was no other activity in the Drainage District between 1936 and 1977, when commissioners were appointed in preparation for the present action.

On August 25, 1977, the Drainage District filed a complaint for injunction seeking to prevent Green Valley from constructing a pipeline between the sewage treatment plant and the drainage ditch so that Green Valley could take advantage of the natural course of drainage through the drainage ditch to the Mackinaw River. The pipeline from Green Valley to the sewage treatment plant would not follow the natural course of drainage.

Green Valley filed a motion to dismiss the complaint charging laches and lack of capacity to sue. The trial court denied the motion to dismiss on those grounds, but granted a motion to dismiss for failure to state a cause of action.

The Drainage District then filed an amended complaint alleging that the drainage ditch was a private drain for the exclusive use and benefit of the landowners and that the discharging of the sewage effluent into the drainage ditch would damage the landowners by depriving them of

exclusive use, causing flooding, causing a health hazard and offensive odors, and also that the use of the drainage ditch by Green Valley would be the taking of Drainage District property without due process of law and that the use of the drainage ditch would cause irreparable damage incapable of calculation.

Green Valley filed an answer denying all material allegations.

On February 2, 1978, the initial hearing was held. Two commissioners of the Drainage District testified on behalf of the district. They said they thought the system would cause flooding, but neither commissioner had consulted an expert concerning the effect of the proposed sewage system on the drainage ditch.

The trial court denied the injunction. After a motion to reconsider, the trial court set aside that order and continued the matter for further hearing.

On June 2, 1978, the second hearing was held. C. H. Skogley, a registered sanitation engineer and Director of Environmental Health for the Tazewell County Health Department, testified on behalf of the village. He testified that the proposed lagoon system is considered one of the better facilities and if operating properly is not harmful to fish or fauna. Green Valley usage would be approximately 30,100 gallons per day. This would increase the water level in the drainage ditch approximately 1/100th of an inch per day. The system was built for 1200 people and could handle up to 120,000 gallons per day. In his opinion, this would make the danger of flooding so minimal that he doubted it would be noticeable.

Frank Vidoni, a registered professional engineer, also testified on behalf of Green Valley. He said there was little danger of odor or pollution. If Green Valley could not use the drainage ditch, the effluent would have to be pumped a distance of 3,000 feet to the Mackinaw River.

After the second hearing the trial court granted the injunction requiring disconnection of Green Valley's sewage system.

On appeal Green Valley raised two points: (1) that the Drainage District is not a legal entity having capacity to sue; (2) that the trial court erred in ordering the issuance of a writ of injunction requiring the disconnection of Green Valley's sewage system.

The basis for the complaint by the Drainage District is that Green Valley proposed to pump sewage contrary to the natural drainage pattern from the village to the sewage plant where it would be discharged into the drainage ditch and thereby take advantage of the natural drainage so that Green Valley sewage would flow through the drainage ditch to the Mackinaw River. In that way Green Valley would pay only the assessment for the maintenance of the ditch, which would be a fraction of the cost of a different system and also a fraction of the cost of

maintenance of the drainage ditch. The landowners along the course of the ditch would subsidize the cost of the sewage system through the higher assessments which they would pay for the maintenance of the drainage ditch.

There was some conflicting testimony regarding the possibility of flooding in the area. Landowners testified that when the Mackinaw River was at a high state it did back up into the secondary ditches which had been constructed to drain into the Drainage District ditch. There was also testimony that beaver dams had been built on the drainage ditch and that some had been there fifteen years and did cause some minor flooding.

As originally constructed the drainage ditch had a one to two side slope, a 20-foot bottom, and a depth of approximately 10 feet. The ditch is approximately 4.5 miles long. At the present time the drainage ditch may be waded by wearing hip boots in some areas and rubbers in others. The engineers admitted that they had not inspected the entire length of the drainage ditch and that it was possible that the ditch might have to be cleaned in order to accommodate the Green Valley effluent. This would cost approximately $10,000 per mile.

We believe that Green Valley's argument that the Drainage District lacks the capacity to sue is incorrect. The district was formed under the Farm Drainage District Act of 1903. In 1955 the Illinois Drainage Code (Ill. Rev. Stat. 1977, ch. 42, par. 1—1 *et seq.*) was enacted. That act provided for a transfer of jurisdiction of certain drainage districts from the Farm Drainage District Act of 1903 to the new act. The commissioners of the existing drainage districts were required to file a report with the circuit court of the county in which the district was located (Ill. Rev. Stat. 1977, ch. 42, par. 1—6). The commissioners of the Sand Prairie Drainage District #1 did not file the report, and there was no attempt to force them to file the report. The commissioners and the landowners along the drainage ditch did not take action to dissolve the Drainage District (Ill. Rev. Stat. 1977, ch. 42, pars. 10—5 and 10—7.1).

■■ There is no automatic dissolution of the drainage districts created under the Farm Drainage District Act of 1903.

■■ ■ Drainage districts are creatures of statute and have no existence without statutory authority. (*Bissell v. Edwards River Drainage District* (1913), 259 Ill. 594, 102 N.E. 990.) Therefore statutory procedure must be followed in the creation and dissolution of drainage districts. Jurisdiction over the existing drainage districts was automatically transferred. There was no action required by the drainage districts in order to maintain their existence. While a report to the circuit court was required, those districts which failed to file the report were not dissolved. Dissolution could be accomplished only by petition to the circuit court. Since there was no petition to dissolve filed, there could be no dissolution. Thus, the drainage

district maintained its character as a legal entity and the capacity to sue.

Green Valley also argues that the trial court erred in granting the injunction. It argues that the trial court should have applied the doctrine of "balancing of conveniences" and "weighing of equities."

■ There is no doubt that Illinois requires the owner of servient lands to accept water cast upon his land from a dominant estate in the natural course of drainage. (*Elser v. Village of Gross Point* (1906), 223 Ill. 230, 79 N.E. 27; *Mello v. Lepisto* (1966), 77 Ill. App. 2d 399, 222 N.E.2d 543; *Bossler v. Countryside Gardens, Inc.* (1976), 44 Ill. App. 3d 423, 358 N.E.2d 352.) Illinois does not, however, permit the owner of dominant lands to discharge water which increases the flow onto the servient lands or interferes with the riparian rights of the servient landowner. (*Elser v. Village of Gross Point.*) The owner of the dominant estate cannot increase the burden of surface water drainage (*Bossler v. Countryside Gardens, Inc.*), nor can he collect water in an artificial manner and then cast it upon the servient estate (*Elser v. Village of Gross Point*).

Green Valley argues that the courts of Illinois have changed their attitude in this regard and now balance the conveniences or weigh the equities in determining whether an injunction should issue.

Historically, Illinois did not balance the conveniences or weigh the equities when private property was involved. (*Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11, 185 N.E. 170; *Shelby Loan & Trust Co. v. White Star Refining Co.* (1933), 271 Ill. App. 266.) There appears, however, to be some authority that this view is changing. *Barrington Hills Country Club v. Village of Barrington* (1934), 357 Ill. 11, 191 N.E. 239, is the leading case determining that in Illinois conveniences are not balanced and equities are not weighed where a private right or private property was sought to be taken by other than due process of law and the party injured sought to enjoin the taking. In 1946 the Illinois supreme court decided the case of *Haack v. Lindsay Light & Chemical Co.* (1946), 393 Ill. 367, 66 N.E.2d 39, which some argue is an indication that Illinois courts will consider matters other than the act or threatened act against the plaintiff and his subsequent actual and substantial injury in determining whether an injunction should issue. The Fifth District in *Fink v. Board of Trustees of Southern Illinois University* (1966), 71 Ill. App. 2d 276, 218 N.E.2d 240, felt that *Haack* overruled *Barrington*. The Second District in *Smith v. City of Woodstock* (1974), 17 Ill. App. 3d 948, 309 N.E.2d 45, stated that *Haack* did not overrule *Barrington*, but merely modified it. These districts then used a balancing of the conveniences or weighing of the equities test in determining whether an injunction should issue.

In 1977 this district decided *Hild v. Avland Development Co.* (1977), 46 Ill. App. 3d 173, 360 N.E.2d 785. We stated that in appropriate

circumstances we could apply the balancing or weighing test in determining whether an injunction was properly issued. We did not find that *Hild* was an appropriate case. We also do not find the instant case to be an appropriate one for the balancing or weighing test.

We deem it noteworthy that in the *Lindsay* case decided in 1946 the appellant (Lindsay Company) was engaged in essential war work. Our supreme court specifically noted that fact in its opinion, as well as the fact that an injunction would seriously impair such work. The supreme court noted that such circumstances may be considered in determining whether the operation of a plant is unreasonable. We can only conclude that in *Lindsay* the supreme court in considering circumstances other than damage to private property was cognizant of an industry's contribution to a nation at war.

■■ Municipalities may take the property of private citizens through their power of eminent domain, by purchase, by contract, and by adverse possession. In the instant case Green Valley has attempted to take the property of the Drainage District by pumping effluent contrary to the natural flow of drainage to a sewage treatment plant located in the Drainage District and thereby use the drainage ditch owned by the Drainage District to discharge effluent into the Mackinaw River. The discharge may well cause flooding and would require the cleaning of the drainage ditch at substantial cost to the landowners in the district. This is the taking of a valuable right without just compensation and without due process of law. This we will not permit them to do.

For the reasons stated above, the judgment of the circuit court of Tazewell County is hereby affirmed.

Affirmed.

STOUDER, P. J., and STENGEL, J., concur.