**OKAW DRAINAGE DISTRICT OF CHAMPAIGN AND DOUGLAS COUNTY, ILLINOIS, Plaintiff–Appellant,**

v.

**NATIONAL DISTILLERS AND CHEMICAL CORPORATION, Defendant–Appellee.**

No. 88–3174.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1989.

Decided Aug. 17, 1989.

Rehearing Denied Sept. 20, 1989.

Brian L. McPheters and Arnold Blockman, Hatch, Blockman, McPheters, Fehrenbacher & Lyke, Champaign, Ill., for Okaw Drainage Dist. of Champaign and Douglas County, Ill., a Mun. Corp., plaintiff-appellant.

Harlan Heller, Mattoon, Ill. and James F. Lemna, Camargo, Ill., for Nat. Distillers and Chemical Corp., a Foreign Corp., defendant-appellee.

Before WOOD, Jr. and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The Okaw Drainage District, a municipal corporation organized under the Illinois Drainage Code, Ill.Rev.Stat. ch. 42, ¶ 1–1 *et seq.*, brought suit against National Distillers and Chemical Corporation in an Illinois state court in 1984, seeking damages of $2 million for breach of contract and an injunction against a trespass or nuisance. National Distillers, which is not a citizen of Illinois, removed the case to federal district court. A three-day bench trial culminated in an oral decision for National Distillers. The drainage district's appeal brings before us something not often encountered by a federal appellate court in Illinois—a dispute over water rights.

The drainage district is responsible for maintaining a 14-mile stretch of the Kaskaskia River in the agricultural region of central Illinois. The region is flat, and the farmers depend on the river for drainage of their land—the drainage district's mission being, as the name implies, to maintain its stretch of the river in a condition that enables effective drainage into it. The U.S. Industrial Chemical Company (U.S.I.), a division of National Distillers, owns land along the river north of the district and has for many years been pumping millions of gallons of water per day (on average) from wells on that land into the Kaskaskia River via a channel it owns. Below the drainage district's southern boundary, where U.S.I. owns a plant for manufacturing alcohol, the company draws from the river an amount of water approximately equal to the amount it pumps in upstream, uses some of the water in the plant, and sells the rest as drinking water to nearby towns.

Of course, en route to the alcohol plant, the water pumped into the river from U.S.I.'s wells flows through the segment of the river maintained by the Okaw Drainage District. The district claims that the added flow complicates the job of maintaining the ditch (that is, the segment of the river within the drainage district), because it erodes the riverbanks, damages the drainage ditches that feed into the river from the adjacent farmland, and, by raising the level of the river, impedes drainage, the surrounding land being only slightly elevated above the river.

Many years ago, in 1951, the drainage district had made a contract with U.S.I. (actually a predecessor of U.S.I., a fact we shall suppress to simplify the opinion) which entitled U.S.I. to use the district's ditch and in exchange obligated the company both to maintain the ditch and to pay an annual fee for its use. The contract was approved by the Illinois state court in which the plaintiff filed this lawsuit, but the parties have not explored the possible bearing of this fact on the suit.

Both as originally drafted and as amended in 1965, the contract set forth U.S.I.'s maintenance obligation in great detail. Among other things, U.S.I. was to keep the bottom of the ditch clear of sandbars and undergrowth and was to eliminate, either by spraying or by clearing, all undergrowth for 15 feet on either side of the ditch. The company carried out the second obligation by spraying until the late 1970s, when restrictions imposed by the Environmental Protection Agency on the use of herbicides forced a switch to clearing. The suit alleges, and photographic evidence introduced by the drainage district appears to confirm, that U.S.I.'s dredging efforts failed to keep the ditch free from sandbars and undergrowth and that its efforts at clearing undergrowth from the banks—efforts admittedly sporadic—were to a significant extent ineffectual. In requiring U.S.I. to keep the 15-foot zone free of undergrowth, the contract had made no exception for roots and saplings of small diameter. Yet once U.S.I. switched from spraying to clearing, it often failed to clear roots and saplings smaller than three inches in diameter; and in places it allowed thick underbrush to grow right up to the water's edge.

U.S.I. in its turn presented evidence that its efforts at dredging and clearing had been adequate, and any breaches of the contract trifling. It pointed out that some

of the farmers who owned the land along the river had forbidden it access to clear undergrowth. Basically it argued that it had acted reasonably in the circumstances, which had changed over the 36 years during which the contract had been in effect.

Shortly after filing this lawsuit the drainage district exercised its contractual right to terminate the contract. Upon termination (effective in 1987), U.S.I. stopped maintaining the ditch and the district took over responsibility for maintenance. U.S.I. has, however, continued to pump water into the ditch from its wells; and it is this continued use that the district sought to enjoin, contending that it is either a trespass or a nuisance, and presenting evidence that the added flow resulting from U.S.I.'s pumping water into the ditch had indeed increased the cost of maintenance. U.S.I. expresses its willingness to reimburse the district for any such increment in cost, but denies that there has as yet been any.

We must consider two separate issues: whether U.S.I. violated the contract before its termination in 1987; and whether the company's continued use of the ditch since then is in violation of the drainage district's rights under property or tort law.

■ Although this was a complex case, the district judge did not prepare a written opinion. Rule 52(a) of the Federal Rules of Civil Procedure, in requiring the district judge to prepare findings of fact and conclusions of law in a civil bench trial, does not prescribe any format for them and certainly does not forbid oral opinions, which frequently are the most efficient and economical method of complying with the rule. But the goals of the rule cannot be attained unless the judge's opinion, whether oral or written, indicates his resolution of conflicts in the evidence with clarity and specificity sufficient to enable the appellate judges to determine what the facts of the case are. The danger of an oral opinion in a complex case is that the judge may fail to identify and resolve these conflicts, leaving us to grope in the dark for the facts on which to base our review of the legal issues.

Most of the district judge's opinion was devoted to reviewing the parties' contentions rather than to finding the facts as such, but in the course of this review he remarked that there was indeed undergrowth within the 15-foot zone and sandbars in the ditch (as is evident from the photographic evidence and from the testimony of both parties' witnesses). He must have thought however either that these apparent violations of the contract were not even prima facie violations or that they were excused, for he said: "We have a difference of opinion as to what should have [been?] taking place, what was required to be taken place and what actions under the contract. But I do not view any of the photographs or any of the testimony as to be so clearly by a preponderance of the evidence to be in violation of that contract." He did not amplify this conclusion. He expressed impatience with the parties' inability to compromise their differences—to reach a "happy ground" as the judge put it—but did not explain why a failure to compromise should result in a judgment *for the defendant*; such a preference will make defendants *less* willing to compromise. The judge expressed some annoyance at the drainage district for asking for $2 million in damages. He plainly thought this amount excessive, but did not indicate whether he thought the district had sustained any damage. He suggested that instead of wasting their money litigating, the parties should have invested that money in cleaning up the ditch.

■ We are left uncertain about the judge's interpretation of the contract. Contracts—especially when sought to be enforced many years after they were drafted—do not always mean what they appear to say, the meaning of a written contract as of any other text being a function of context as well as of semantics. See, e.g., *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620–22 (7th Cir.1989). So the fact that U.S.I. did not comply with every duty imposed by the contract if read literally and without regard to changed circumstances does not dispose of the breach of contract issue. The parties may not have intended that U.S.I. be obligated to clear under-

growth if the farmers owning the land to be cleared objected. It seems unlikely—to say the least—that the contract required the company to commit a trespass; and there is no argument that either U.S.I. or the drainage district had an easement to cut the undergrowth on the banks. And maybe when the EPA forbade spraying—an eventuality the parties probably had not foreseen when the contract was signed, long before there was an EPA—the strict duty of eliminating all undergrowth within the 15-foot zone was modified by the doctrine of impossibility or by some other doctrine of excuse. Or maybe not—maybe U.S.I.'s obligations were strict, and it bore the risk of unforeseen change in the cost of maintaining the ditch. The district judge mentioned none of these vital issues. Nor did he comment on the drainage district's contention that contracts between governmental and private entities should be construed favorably to the former—a principle that has some slight support in Illinois case law, see *People v. Flynn,* 13 Ill.2d 368, 378, 150 N.E.2d 183, 190 (1958), as elsewhere, see *Correct Piping Co. v. City of Elkins,* 308 F.Supp. 431, 433 (S.D.N.Y.1969), although it makes little sense to us: if followed it would raise the price the government would have to pay to obtain services. Cf. *Powers v. United States Postal Service,* 671 F.2d 1041, 1044 (7th Cir.1982).

 The judge never interpreted the contract, perhaps because he did not think he had to decide whether the contract had been broken. He kept saying that the district and U.S.I. would have to learn to live with each other. However, and whether rightly or wrongly, no federal judge, trial or appellate, has been given the broad discretion that medieval Lord Chancellors of England enjoyed to disregard the law in an effort to do more perfect substantive justice. Maybe as a matter of prudence or ethics the drainage district should not have insisted on strict compliance with the contract but instead should have used its taxing power to obtain funds to help U.S.I. maintain the ditch in the changed circumstances created by the EPA's restrictions on the use of herbicides. And as a matter of fact all the district has gained from

terminating the contract thus far is the expense, heretofore borne by U.S.I., of maintaining the ditch. But a judge in a contract case is not to enact his personal standard of fair dealing or to decide what is in the parties' best interests.

 We do not deny the role of morality—of equity in the broad sense—in contract law as in all law. Often a contract leaves the parties' contractual obligations imperfectly defined. In filling in the missing details, the court will perforce use the standard of the reasonable contracting party, see, e.g., *Morin Building Products Co. v. Baystone Construction, Inc.,* 717 F.2d 413 (7th Cir.1983), and notions of reasonableness are influenced by prevailing moral standards. But there are no missing details in the contract here, and the court made no finding that the contract is defeasible on any ground recognized by the law of Illinois. Being unable to determine from the judge's oral opinion what he thought the contract meant, or to reconstruct from the opinion the essential facts bearing on liability for breach of contract, we are compelled to remand the contract phase of the case for further findings.

Besides asking for damages for breach of the contract, Okaw Drainage District asked the district judge to enjoin U.S.I. from continuing to run its water through the ditch. Although this part of the complaint raised intricate questions as we shall see, the judge's only comment on it was: "I am not going to enjoin the pumping of this water into the river. We have been operating on this premise for so long that the mind of a man runneth not to the contrary. And it must continue. If it were not for the contract which of course lends legality to it from the inception, we might very well have a new admiralty question in useage [*sic*] and rights down below." The judge seems to be suggesting that U.S.I. has a prescriptive right to pump water into the river, or if not then maybe a right under admiralty law. The suggestion is at once incorrect and irrelevant. U.S.I. does not contend that it has any prescriptive rights; neither party suggests that the Kaskaskia River is navigable or that any of the uses

made by it, whether by these parties or by anyone else, relates to navigation; and if it were navigable, the parties' rights would be determined by federal rather than state law, yet neither party raised any issue of federal law.

The grounds on which the drainage district seeks an injunction are twofold. First, it argues that U.S.I. has no right to use the district's ditch without the district's consent. That consent was given in the contract first signed in 1951 and was withdrawn when the contract was terminated in 1987; from that moment on, U.S.I. was a trespasser in the district's ditch. Second, the district argues that the U.S.I.'s continued use of the ditch is a nuisance because of the added cost which that use imposes on the district.

■■■■ The first argument would be straightforward if the drainage district had built and owned the ditch, for with immaterial exceptions (one in the Illinois Drainage Code itself, see Ill.Rev.Stat. ch. 42, ¶ 12–3) the owner of property has the exclusive right to the use of the property and an automatic right to an injunction against a trespasser. See, e.g., *Drainage District #1 v. Village of Green Valley*, 69 Ill. App.3d 330, 25 Ill.Dec. 766, 387 N.E.2d 422 (1979). However, in this case the ditch is a section of a river, and U.S.I. is a riparian owner, that is, an owner of property bordering on a river or other watercourse, or a lake. Under a system of riparian property rights, which is the property rights system applicable to U.S.I.'s claimed right to pump water into the Kaskaskia River upstream and take an equivalent amount out downstream, each riparian owner is entitled to make a reasonable use of the river, with what is "reasonable" depending on the balance between his own needs and those of the other riparian owners. See, e.g., *Evans v. Merriweather*, 4 Ill. (3 Scam.) 491 (1842); Restatement, Second, Torts, §§ 849–50A (1979). Although we can find no case, we believe that a riparian owner does not lose his riparian rights just because part of the river is under the control of a drainage district. Nor do we read the 1951 contract as a commitment by U.S.I. to

stop using the ditch when and if the district exercised its right to terminate the contract—in other words, as an abandonment of its riparian rights. The fact that the company asked the district's permission to use the ditch does not prove that it had to ask.

■■■■ A riparian owner may use the river and its waters for drinking, drainage, recreation, transportation, powering a mill, dilution of pollutants, and a variety of other activities—but is one of these other activities the use of the river as a conduit for water that the owner pumps into the river for his use downstream? We have found no case on this point either, but we can think of no reason why it would not be a lawful riparian use. The use must be beneficial, but "there is no closed class of beneficial purpose." Restatement, *supra*, § 850a, comment b on clause (a). The law is not prejudiced against novelty.

It is true that there are cases in Illinois and elsewhere that limit, sometimes severely, the right of the riparian owner to collect water and then discharge it in a manner injurious to another riparian owner. See cases cited in *Drainage District #1 v. Village of Green Valley, supra*, 69 Ill. App.3d at 334–35, 25 Ill.Dec. at 769, 387 N.E.2d at 425. The present case is analogous. We may assume therefore that riparian owners using the Kaskaskia River for drainage could complain about unreasonable interference from another riparian owner, U.S.I., who by pumping water into the river interferes (so it is alleged) with that drainage. See Annot., *Modern Status of Rules Governing Interference with Drainage of Surface Waters*, 93 A.L.R.3d 1193 (1979). But the question whether U.S.I. is interfering with the property rights of other landowners is different from whether it has any property right of its own.

■■■■ The drainage district's contention that riparian ownership excludes all right to put water into a river as distinct from taking it out is inconsistent not only with the concept of beneficial use but also with the raison d'être of a drainage district—to enable the diversion of surface waters into

the river that drains the land in the district—and with the "enemy waters" (or "common enemy") and "civil law" doctrines. As reconciled, merged, and interpreted in the modern cases, these doctrines of water law allow a landowner to divert surface water that has collected on his land to another's land, provided his conduct is, all things considered, reasonable. See, e.g., *Templeton v. Huss*, 57 Ill.2d 134, 311 N.E.2d 141 (1974); *Keys v. Romley*, 64 Cal.2d 396, 50 Cal.Rptr. 273, 412 P.2d 529 (1966); *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971). This case is different in that U.S.I. is not failing to prevent surface water on its land from flowing onto the lands of its neighbors; it is deliberately adding to the stream in a way potentially harmful to those neighbors. But in this formulation is buried a second difference. U.S.I. is not flooding any of its neighbors' lands, as in *Colwell Systems, Inc. v. Henson*, 117 Ill.App.3d 113, 72 Ill.Dec. 636, 452 N.E.2d 889 (1983), but is merely creating a risk that those lands will drain less efficiently. It is a case of shared use of the river, and the issue between U.S.I. and the other riparian owners is whether U.S.I. is in effect taking for itself more than a reasonable share of the river's value.

■■ But here we come up against the fact that none of the riparian owners is a party to this suit. None is complaining that U.S.I. is abusing its rights to the use of the river. The only complainant is the Okaw Drainage District, which does not claim either to be a riparian owner or to be suing as the representative of those owners. We attach little importance to these omissions. The drainage district is responsible for the drainage of the farmlands in the district, and it is therefore the logical entity to represent the farmers who own these lands in a conflict with a riparian owner who owns no land in the district. (U.S.I.'s pumps lie north and its plant south of the district boundaries, and its riparian lands are likewise north and south of those boundaries.) Perhaps, therefore, its representative status is implicit. More important, it makes little or no practical difference whether the drainage district is equated to a riparian owner. The only right of

such an owner is to the reasonable use of the river. Any owner or rightful possessor of land, riparian or not, can complain about a nuisance—that is, a condition which unreasonably interferes with the use and enjoyment of his land, including an interference with the flow of surface water to or from the land. See Restatement, *supra*, § 833. *Templeton v. Huss* was such a case; the plaintiff was a landowner, but not an owner of riparian law. The standard is the same, regardless: reasonableness.

True, Okaw Drainage District is not (so far as appears) a landowner; but since U.S.I. does not contest its right to proceed on a nuisance theory, we can pretend it is. It is a harmless pretense, since with qualifications unnecessary to discuss anyone can complain about negligent conduct that harms him, and negligence is merely a failure to act with the care that a reasonable person would use in the circumstances. The district claims that as a result of U.S.I.'s use of the river as a conduit, its own expense of maintaining its stretch of the river has been increased, and such a claim is readily stated in negligence terms. In some jurisdictions—those particularly friendly to *Rylands v. Fletcher*—the injurer might be strictly liable for water damage of the sort alleged here. See Prosser and Keeton on the Law of Torts § 78 (5th ed. 1984).

■■ We need not pursue the question of the proper standard of liability any further. Once the drainage district's claim of trespass is rejected, the fatal weakness of its case lies on the remedial rather than on the substantive side of the ledger. The district is not seeking damages for the additional cost of maintenance that the pumped-in water imposes on it, or even an injunction against U.S.I.'s pumping water into the ditch without paying that cost. Those would be forms of relief tailored to its claim of nuisance. It is seeking instead an injunction against U.S.I.'s pumping *any* water into the ditch. An injunction so much broader in scope than the injury sought to be prevented would, if granted, exhibit a lack of equity on its face, and this

is reason enough for refusing to issue the injunction. The broader point is that an injunction other than one designed to secure a property right may not be granted without consideration of the equities, including the costs that the injunction is likely to impose on third parties—see, e.g., *Evans v. City of Evanston*, 881 F.2d 382 at 385 (7th Cir.1989); *United States v. City of Chicago*, 870 F.2d 1256, 1262–63 (7th Cir. 1989); *Kasper v. Board of Election Commissioners*, 814 F.2d 332, 338 (7th Cir.1987) —signally including in this case the downstream towns that appear to be dependent for their supply of drinking water on the water they buy from U.S.I. Once the existence of these dependents was brought to the drainage district's attention, the district was obliged to present evidence that, when the cost to these innocent third parties was considered, the injunction—whose breadth seems inequitable quite apart from third-party effects—would nevertheless be reasonable in the circumstances. The district presented no such evidence and indeed failed utterly to show an equitable entitlement to the injunction it sought. So clear is this that the district judge's denial of the injunction must be upheld even though his analysis was incomplete.

 This is not to say that before issuing an injunction against a firm a judge must always consider the impact on the firm's customers, suppliers, employees, etc.; ordinarily the firm is an adequate representative of the web of interests of which it is the center. But the apparent dependence of several towns on U.S.I. for their drinking water makes the case special, since, depending on the terms of their contracts with U.S.I. and on the towns' alternative sources of supply, the cost to their residents of losing this water might greatly exceed the cost to U.S.I.

 The issue of injunctive relief might stand differently if the district had succeeded in establishing an owner's right to exclude U.S.I. from the ditch. The essence of a property right is that the owner need not show, in order to prevent interference with it, that it is worth more to him than to a trespasser. See, e.g., *Barrington Hills Country Club v. Village of Barrington*, 357 Ill. 11, 20, 191 N.E. 239, 243 (1934). To require such proof would convert property rules into liability rules. But the drainage district did not establish an owner's right; it does not own the *river*. To obtain an injunction, therefore, it had to show that the balance of equities inclined to it. See *Smith v. City of Woodstock*, 17 Ill.App.3d 948, 955, 309 N.E.2d 45, 49 (1974).

 The issue of injunctive relief might also stand differently if the district had sought a narrower injunction, one designed to limit rather than to eliminate U.S.I.'s right to use the Kaskaskia River as a conduit for its water to its plant and to the towns that buy its excess water. But the district must have had its own reasons for not seeking the narrower injunction. A showing of changed circumstances might entitle it to seek the narrower injunction in the future, but we need not speculate about that possibility now. In the case as it comes to us there is a fatal mismatch between on one side the only viable theories of liability—theories entitling the district to enjoin unreasonable conduct harmful to it—and on the other side the drastic remedy sought, which would make sense only if the district had proved that U.S.I. was a trespasser. The remedy must be proportioned to the wrong. See, e.g., *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.).

The decision of the district court is affirmed insofar as it denies an injunction, but is otherwise vacated and remanded for further findings, consistent with this opinion, on the plaintiff's claim for breach of contract. No costs will be awarded in this court.

AFFIRMED IN PART, VACATED IN PART, REMANDED WITH DIRECTIONS.