956 F.2d 272
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
OKAW DRAINAGE DISTRICT OF CHAMPAIGN AND DOUGLAS COUNTY,
ILLINOIS, a municipal corporation, Plaintiff-Appellant,
v.
NATIONAL DISTILLERS AND CHEMICAL CORPORATION, a foreign
corporation, Defendant-Appellee.
 No. 90-2462.
 United States Court of Appeals, Seventh Circuit.
 March 9, 1992.
Rehearing Denied April 23, 1992.
 
 Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 The Okaw Drainage District sued National Distillers and Chemical Corporation.[1] The district court entered judgment for National Distillers after a bench trial. The drainage district appealed, and this court affirmed the denial of injunctive relief, but remanded the breach of contract issue for further findings of fact, consistent with the opinion, on the claim for breach of contract. Okaw Drainage Dist. of Champaign and Douglas County, Ill. v. National Distillers & Chemical Corp., 882 F.2d 1241 (7th Cir.1989) (Okaw I ). The district judge filed an opinion including portions entitled, Findings of Fact and Conclusions of Law. Okaw Drainage Dist. of Champaign and Douglas County, Ill. v. National Distillers & Chemical Corp., 739 F.Supp. 459 (C.D.Ill.1990) (Okaw II ), and the drainage district appealed again.
 
 
 2
 * The drainage district is a municipal corporation responsible for maintaining an improved 14 mile stretch of the Kaskaskia River as a drainage ditch. In 1951, a predecessor of National Distillers sought permission to use the ditch to transport water from its wells, which are upstream from the drainage district, to its plant and certain towns, all located downstream from the district. The amount of well water varies from none to 9 or 10 million gallons per day. The defendant will hereafter be referred to as "USI," an abbreviation of United States Industrial Chemical Company.
 
 
 3
 The parties entered into a contract in 1951, approved by the appropriate Illinois court in 1952, and modified in 1965.
 
 
 4
 The contract required USI (actually a predecessor of defendant and USI) to reconstruct the ditch in accordance with specifications. After reconstruction, USI was to spray the ditches and their berms up to 15 feet outward, or in the alternative, remove and dispose of all trees and brush thereon. This was to be done annually. USI was also to clean the ditches by dredging, so as to restore the original cross-sectional shapes and gradients. Clean-out must be performed once in 10 years, but may be undertaken by a continuing yearly program. Spraying ceased about 1980 because of restrictions on feasible herbicides. The contract remained in force until USI terminated it in 1987.
 
 
 5
 In October, 1984, the drainage district filed a complaint in state court alleging USI's failure to cut brush and dredge as required. USI removed the case to federal court and denied allegations of breach. The case was tried before Judge Mills in August, 1988.
 
 
 6
 Judge Mills ruled orally, stating among other comments, that the plaintiff did not meet its burden of proving its case by a preponderance of the evidence.
 
 
 7
 In Okaw I, another panel of this court decided,
 
 
 8
 Being unable to determine from the judge's oral opinion what he thought the contract meant, or to reconstruct from the opinion the essential facts bearing on liability for breach of contract, we are compelled to remand the contract phase of the case for further findings.
 
 
 9
 882 F.2d at 1245. This court suggested several issues which might have been addressed, but were not. See id. at 1244-45.
 
 
 10
 On remand, Judge Mills filed a written opinion, finding for defendant. The opinion has been treated by the parties as a final judgment and plaintiff timely appealed.
 
 II
 
 11
 In his conclusions of law, Judge Mills stated that
 
 
 12
 The essential purpose underlying the contract was the maintenance of the main ditch in such a manner which provided for the free flow of the water and adequate drainage of the surrounding land.... Keeping in mind the underlying purpose of the contract ... we must conclude that the dredging and brush clearance performed by National Distillers was in conformance with the contract.
 
 
 13
 Okaw II, 739 F.Supp. at 462 and 464.
 
 
 14
 As already observed, "the contract set forth USI's maintenance obligation in great detail." 882 F.2d at 1243. It was far from a contract "reasonably to maintain the ditch" or maintain it sufficiently to avoid obstruction. Portions of the specifications, which are part of the contract, follow:
 
 Clean-out:
 
 15
 The dredging shall consist of the excavation of bars, drifts and accumulated sediment and debris in the bottom of the ditches, in order that the ditch bottoms may be restored to the established widths, depths and gradients as set forth and recited in the contract between the two districts establishing the joint drainage system. Specific reference is hereby made to the maps, profiles and cross-sectional drawings depicting and fixing such widths, depths and gradients on file in the office of the County Clerk of Champaign County, Illinois.
 
 
 16
 Specifications IC., made applicable to "Clean-out Work" by IID. Clean-out work is to be accomplished by either continuous or spot dredging, and "may be undertaken ... as a single operation or as a continuing yearly program of clean-out work during said 10-year periods." Specifications IIA. as amended January 29, 1965.
 
 Clearing:
 
 17
 The annual clearing ... shall consist of the cutting, removing and disposing of all willows, trees, brush, logs and other like growth and debris growing or found within the cross-sectional area of the ditches, in the manner set forth in Paragraph B of Article I of these specifications.
 
 
 18
 IIC., as amended. IB. limits the height of stumps of trees and brush after cutting according to their diameters, and requires the deadfall to be removed and disposed of by burning on the drainage right-of-way. IIA., as amended, provides that the maintenance work "consists of the annual spraying, or clearing and spraying, of the bottoms, side slopes and uncultivated berms to a distance of fifteen (15) feet outward on each side from the tops of the side slopes ..." and the parties seem to agree that after spraying ceased, clearing was required to the same extent. See Okaw I, 882 F.2d at 1243; Okaw II, 739 F.Supp. at 461.
 
 
 19
 We find no basis for Judge Mills' conclusion that the contract required only such dredging and clearance as would leave a free flow of water and adequate drainage of the surrounding land. Nothing in his opinion suggests that any conduct or communications of the parties showed mutual intention to depart from the terms of the contract. There are no findings of demonstrations of such intent, and we perceive no support for that proposition. Although there are often circumstances where it is appropriate to look at the purpose of a contract in order to interpret it, mere fulfillment of the parties' general purpose does not justify disregarding specific terms of their contract, especially when the expressed terms are consistent with the general purpose. A well established rule of contract interpretation is that every provision of a contract must be given effect because it is assumed the provisions were inserted deliberately. Restatement of Contracts, Second, § 203(a).
 
 
 20
 The district judge cited American Fletcher Mortgage Co. v. Cousins Mortgage and Equity Investments, 623 F.2d 1228, 1237 (7th Cir.1980), to support his reliance on the purpose of the contract. In that case this court held that implying a term in an agreement between the parties would be contrary to the intent of the parties as evidenced by a letter agreement between the parties. In the instant case, by contrast, the district judge would justify ignoring the explicit terms as to dredging and clearing by reference to the very general purpose of the parties. His interpretation of the contract was erroneous.
 
 III
 
 21
 Judge Mills' language concerning defendant's having done enough dredging and clearing to have accomplished the essential purpose of the contract suggests the doctrine of substantial performance. Illinois does apply that doctrine, but it is not relevant here. "[A] purchaser who receives substantial performance of a building contract must pay the price bargained for, less an offset for defects in what he received as compared to what strict performance would have given him." People ex rel. Peterson v. Omen, 124 N.E. 860, (Ill.1919), quoted in W.E. Erickson Const. v. Congress-Kenilworth, 503 N.E.2d 233, 236-37 (Ill.1986); Brink v. Hayes Branch Drainage Dist., Etc., 376 N.E.2d 78, 81 (4th Dist.1978). Interestingly in the latter case then Justice Mills wrote for the court, applying the doctrine to a suit by a construction company found to have substantially performed its contract for a drainage district.
 
 
 22
 Here we have the converse, the landowner is claiming that the party who agreed to perform the work did not render full performance, and even assuming substantial performance, the landowner would be entitled to recover "for defects in what he received as compared to what strict performance would have given him."
 
 IV
 
 23
 Judge Mills' critical finding of fact was, as originally, that plaintiff had failed to prove by a preponderance of the evidence that the defendant's actions violated the contract. It is logical to assume that in finding no violation he was applying the erroneous interpretation of the contract just discussed. It would follow that there must be new findings, consistent with a proper interpretation.
 
 
 24
 We have, however, examined the record to see whether another remand could justly be avoided. We conclude that it cannot.
 
 A. Clean-Out and Dredging
 
 25
 Plaintiff's experts were Donald Wauthier, an agricultural engineer, and his employer, Tom Berns, a professional engineer, surveyor, and land planner. They took measurements along the entire ditch at low water in July, 1985 and July, 1986. They made comparison of the cross-sections and profile of the ditch with the drawings referred to in the contract. Their charts and testimony tended to show the presence of sand bars and sediment. The bottom they observed was above the bottom as designed at many points (up to 1.9 feet at 2 locations), although lower at some. At all 23 stations along the river, the bottom width they measured was less than the designed width, the difference varying from 2 to 15 feet.
 
 
 26
 Wauthier's crew took some 400 pictures in July, 1985, at locations along the ditch. Eighty (80) more were taken in July, 1986, and about 135 in October, 1986. Bars and accretions are visible in a number of pictures, and brush up to the water's edge in many.
 
 
 27
 Mr. Berns estimated that 104,000 cubic yards of sediment needed to be cleared from the ditch in order to bring it into conformity with the 1952 design. He estimated the probable cost of removing the sediment above the design line at $150,000, adjusted upward for the repair of eroded banks, and for inflation.
 
 
 28
 Defendant's experts were Charles Danner, a civil engineer, and John Guillou, a hydraulic engineer. In November, 1986, at high water, Danner located 5 stations along the ditch which he believed more accurately represented stations referred to in the 1952 reports. He made relevant measurements at those stations and at a 6th station in November, 1987.
 
 
 29
 Guillou testified that Danner's measurements showed that at those stations, the bottom was below the bottom as designed and the cross-sections were as good as the design cross-sections, or better. Although he observed some lateral accretions, and some silt in the corners which he considered unimportant, he did not observe the bars which Wauthier and Berns had reported at those locations.
 
 
 30
 There was testimony as to the changes in the volume of water in the ditch from time to time, the fact that sand bars will form and disappear over time, and the effect of varying volume of water upon sediment.
 
 
 31
 USI employees presented figures showing amounts paid contractors for dredging and clearing during the years from 1980-86. Crews of USI employees performed clearing at times. Two (2) contractors testified. They had dredged out sand bars at locations pointed out to them. When they worked in a particular area they would dig until they struck the clay "as built" bottom. It is clear that the contractors did not otherwise attempt to conform the existing ditch to the design.
 
 
 32
 Okaw II also sets forth a summary of the evidence. The evidence concerning performance of the obligation to clean the ditch presents issues for a factfinder, and a remand for resolution of the issues is required. We intimate no opinion as to the ultimate result. We leave to the discretion of the district court whether to reopen for additional evidence.
 
 B. Clearing
 
 33
 There is little question but that to a considerable extent defendant failed to perform the annual clearing of brush, as required by the contract.
 
 
 34
 We have already referred to the photographs in 1985 and 1986 showing brush close to the water's edge. Mr. Wauthier referred to the total length of the berms, 28 miles and testified that 19 1/2 were lightly covered with heavy brush, 6 with medium brush, and 1 1/2 with heavy brush. Mr. Guillou conceded that the berm had not been cleared as required by the contract, although he criticized the contract for so requiring.
 
 
 35
 Mr. Calvert, an area production superintendent for USI up to 1987, testified that there had been some cutting, "but not the whole thing, no." Mr. Schafer, day supervisor at USI water plant, testified that brush was cut in the years 1982, 1983, 1984, 1986, and 1987, but admitted that in none of those years was all the brush cut. There was testimony that some brush, when cut, was left without burning, as required.
 
 
 36
 Mr. Berns estimated the cost of removal of the brush at $105,900.
 
 
 37
 There were references to difficulties in obtaining permission of landowners in order to reach the berms of the ditch. Only 1 landowner, however, was identified by witnesses for the defendant. One (1) of the commissioners testified that he had resolved the matter with Mr. Easton, that landowner, who later left the property. The commissioners obtained a formal easement from his successor. Except for Mr. Easton and 1 other, he was not aware of any refusals of access which were made know to the commissioners.
 
 
 38
 Witnesses on both sides said the ditch was relatively well maintained with respect to brush, and compared favorably with other ditches in Illinois. Notwithstanding that, the contract made specific requirements which were not performed.
 
 
 39
 A finding of full performance of USI's obligation to clear brush would be clearly erroneous, in our view. On remand, damages should be awarded.
 
 
 40
 The judgment is VACATED and the cause REMANDED for further findings with respect to clean-out and dredging, and for an award of damages to plaintiff with respect to clearing of brush.
 
 
 41
 VACATED and REMANDED.
 
 
 
 [1]
 Jurisdiction is founded on diversity. All parties have treated Illinois law as controlling substantive issues