Gants, Ralph D., J.
On March 15, 2004, the defendant David S. Evans (“Evans") resigned his employment as Senior Vice President and Director of the plaintiff National Economic Research Associates, Inc. (“NERA”), an economic consulting firm, and the next day commenced employment with the defendants LECG Corporation and LECG, LLC (collectively, “LECG”), a competitor of NERA, performing essentially the same work he had performed at NERA. Soon thereafter, NERA (and its corporate parent, Marsh & McLennan Companies, Inc. (“M&M”)) filed the instant action against Evans and LECG, alleging:
that Evans breached a non-solicitation agreement he had entered into with NERA when he exercised M&M stock options (Count I);
that LECG tortiously interfered with this non-solicitation agreement (Count II);
that Evans breached the fiduciary duty he owed to NERA as an officer and director (Count III);
that Evans misappropriated a corporate opportunity by essentially selling his NERA practice group to LECG (Count IV); and
that LECG engaged in unfair and deceptive acts and practices in trade or commerce, in violation of G.L.c. 93A (Count V).
The defendants now move for summary judgment on all claims against them. For the reasons detailed below, the defendants’ motion for summary judgment is ALLOWED IN PART AND DENIED IN PART.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmov-ing party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the plaintiffs and should not be misunderstood as findings of the Court.
Evans began his employment with NERA on September 12, 1988 as an economic consultant, with the title of Vice President. Before joining NERA, Evans was an associate professor of economics at Fordham University and did economic consulting under the name of the consulting firm he created and managed — Chicago Economic Research Associates (“CERA”). When he joined NERA in 1988, the only matters he brought with him from CERA were a handful of employment discrimination cases and perhaps one intellectual *439 property case, none of them for Microsoft Corporation (“Microsoft”) or VISA USA (“Visa”). During that first fall, when he was working at NERA but still teaching at Fordham,[1] he spent roughly half of his time working on assigned cases and the other half on business development. Roughly 95 percent of the cases he worked on originated at NERA.
In 1991, Evans moved to NERA’s Cambridge, Massachusetts office. That year, the law firm of Heller, Ehrman, which was representing Visa, contacted Richard Schmalensee, a professor of economics at the Massachusetts Institute of Technology and its Sloan School of Business who was then working for NERA as an independent contractor, to provide expert testimony in Visa’s antitrust litigation with Sears Roebuck Corporation. Schmalensee asked Evans to work with him on this project. Beginning with this project, Schmalensee and Evans built an ongoing relationship with Visa that resulted in NERA performing work for Visa in at least 18 projects between 1995 and 2004, resulting in NERA billings to Visa of over $14.5 million. Schmalensee was an independent contractor on many of these projects, although his involvement dwindled over time. Evans served as the NERA director and group leader for all of them.
In 1994, Evans became a Senior Vice President of NERA and a member of its Board. That year, an attorney with the law firm of Preston Gates asked about the availability of Schmalensee and Michael Klass, a NERA employee, to work on a project for Microsoft. Microsoft soon retained NERA to work on the project, and Schmalensee and Klass were assigned to it. When Microsoft grew dissatisfied with Klass’s performance, Schmalensee asked Evans to help out, which he did. This introduction evolved into a long-term relationship with Microsoft in which Evans between 1995 and his resignation in 2004 served as the group leader and director for at least 40 Microsoft projects, resulting in NERA billings of over $37.7 million. Roughly half of this work was litigation; Schmalensee served as a lead expert witness in the Department of Justice’s antitrust case against Microsoft. The other half was policy work; Evans coordinated Microsoft’s financial sponsorship of various academic economists who performed research and writing on matters important to Microsoft.
In 2002, with Microsoft facing antitrust scrutiny from European regulators, Evans asked NERA’s Madrid office for assistance on Microsoft work. Evans soon began to work with Jorge Padilla, who had joined NERA as a full-time employee in May 2000 and was based in Madrid. Together, Evans and Padilla formed what became known as the Evans-Padilla group to develop antitrust and competition policy business in Europe. Evans and Padilla shared the origination fees paid by NERA on projects they developed jointly for their group.
By 2004, largely as a result of the work he was directing on projects for Visa and Microsoft, roughly 25 NERA employees worked for Evans in his own group, and another 11 worked for Evans and Padilla in the Evans-Padilla group. Evans was paid handsomely by NERA for the work he performed and was bringing in. In 2003, his last full year at NERA, NERA paid Evans total compensation of over $2.5 million.
During Evans’s employment with NERA, he was granted various stock options by M&M. Under the Terms and Conditions of these stock options, Evans was required to execute a non-solicitation agreement if he wished to exercise them. Evans exercised stock options on four occasions, in May 1991, March 2000, May 2002, and, finally, on December 9, 2002. As a result of the exercise of these stock options, Evans yielded a personal profit of more than $1.0 million.
Under the December 9, 2002 Non-Solicitation Agreement for Exercise of Stock Options (“Non-Solicitation Agreement”), Evans agreed that, if his employment with NERA terminated for any reason other than death or total disability within three years of the exercise of the option, he would not:
for a period or two (2) years from date of termination, directly or indirectly, . . . :
(a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or
(b) solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.
The Non-Solicitation Agreement specifically declares that it “shall be construed in accordance with the laws of the State of New York.”
In the late summer or early fall of 2003, Evans met with LECG’s Executive Director and its Chairman of the Board about the possibility of coming to work with ■ LECG. The negotiations progressed to the point that, on January 13, 2004, Evans and LECG entered into a non-binding Term Sheet that set forth the parties’ basic understanding as to Evans’s future employment with LECG. In short, he would become Vice Chairman of LECG Europe, a division that LECG would establish when Evans joined them, and he would receive $22.5 million in installments for the global antitrust expert *440 consulting practice he would develop, including $3.75 million to be paid upon the commencement of his employment and another $3.75 million six months later.
On March 12, 2004, Evans and LECG signed a Director Services Agreement which set forth the final terms of their arrangement. Apart from his annual compensation, Evans was to receive a “signing bonus” of $6.4 million, half to be paid when he commenced employment and the other half six months later, as well as performance bonus payments dependent upon whether his global practice met specified objectives. This Director Services Agreement also included non-solicitation and non-competition covenants that barred Evans from competing with LECG or soliciting its clients or employees for three years. That same date, they also signed an Indemnification Agreement in which LECG agreed to indemnify Evans without limit for any claims that NERA or M&M may make against him.
As earlier stated, on March 15, 2004, Evans resigned from NERA and commenced his employment at LECG the next day. Most of Evans’s clients, including most importantly Visa and Microsoft, came with him to LECG, as did Padilla and most of the employees in the Evans group and the Evans-Padilla group. None of the departing employees, including Padilla, had executed any agreement comparable to Evans’s that limited their ability to solicit or accept business from former NERA clients following the termination of their employment with NERA.
DISCUSSION
Breach of Non-Solicitation Agreement
In the memoranda filed in support of and in opposition to summary judgment, the parties vigorously (and ably) debate whether Evans solicited his former clients at NERA to come join him at LECG in violation of the Non-Solicitation Agreement. However, there can be no credible dispute that Evans violated that part of the Agreement that barred Evans, for a period of two years following his termination of employment at NERA, from “accept(ing) business of the type offered by [NERA]” from clients he or his subordinates serviced at NERA. The issue, then, is not whether Evans breached this provision (he did), but whether the breach is enforceable under the New York law that the parties agreed would govern the Non-Solicitation Agreement. See Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F.Sup.2d 525, 534 (S.D.N.Y. 2004) (the court’s duty as to a non-compete agreement “is merely to determine the extent to which the parties’ agreement is reasonable under this analysis and to enforce it accordingly”).
In examining this issue, all parties point to the New York Court of Appeals decision in BDO Seidman v. Hirshberg, 93 N.Y.2d 382 (1999), which all agree is controlling but which the parties interpret quite differently. Hirshberg had been a manager at BDO Seid-man (“BDO”), a national public accounting firm, who resigned to join another accounting firm. When promoted to the position of manager at BDO, he was required to execute a Manager’s Agreement that provided that “if, within 18 months following the termination of his employment, he served any former client of BDO’s Buffalo office, he would compensate BDO ‘for the loss and damages suffered’ in an amount equal to one and one half times the fees BDO had charged that client over the last fiscal year of the client’s patronage.” Id. at 387. The Manager’s Agreement did not bar him from serving these former BDO clients, but it required him to pay liquidated damages if he chose to do so. Id. at 388. Nonetheless, the Manager’s Agreement was still recognized by the Court of Appeals as a “form of ancillary employee anti-competitive agreement that is not per se unlawful but will be carefully scrutinized by the courts.” Id.
In conducting that careful scrutiny, the Court held that, to be found reasonable, an employee agreement not to compete must satisfy each prong of the three-pronged test:
1. The restraint on competition must be “no greater than is required for the protection of the legitimate interest of the employer”;
2. It may not “impose undue hardship on the employee”; and
3. It may not be “injurious to the public.”
Id, at 388-89.
As to the first prong, the Court found the “(p)rotection of customer relationships the employee acquired in the course of employment may indeed be a legitimate interest.” Id. at 391. Quoting what it characterized as a “seminal article” in the Harvard Law Review, the Court observed, “The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction.” Id. at 391-92, quoting Harlan M. Blake, “Employee Agreements Not to Compete,” 73 Harv.L.Rev. 625, 661 (1960). The Court concluded: *441 Id. at 392. See also Johnson Controls, Inc., 323 F.Sup.2d at 534 (“it is clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer’s expense”). In making clear that the employer had a legitimate interest in protecting its goodwill and that the employer’s goodwill included any goodwill its employee developed from servicing the client, the Court also made clear what restraints were greater than needed to protect the employer’s legitimate interest and, thus, would not be enforceable— any prohibition on continuing to service clients who the employee brought to the firm with him, or on servicing clients of the firm that were not serviced by the employee himself. BDO Seidman at 392-93.
*440 Then, the employee has been enabled to share in the goodwill of a client or customer which the employer’s overall efforts and expenditures created. The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer’s expense, to the employer’s competitive detriment... It follows from the foregoing that BDO’s legitimate interest here is protection against defendant’s competitive use of client relationships which BDO enabled him to acquire through his performance of accounting services for the firm’s clientele during the course of his employment.
*441 As to the second prong, the Court of Appeals found that an 18-month restraint “appears to represent a reasonably brief interlude to enable the firm to replace the client relationship and goodwill defendant was permitted to acquire with some of its clients.” Id. at 393. The Court concluded that, since Hirshberg could retain the personal clients he brought with him to BDO and compete for any non-BDO clients, as well as any BDO clients he never serviced while employed there, the restraint did not impose an undue hardship upon him. Id.
As to the third prong, the Court found that the restraint on competition would not injure the public, declaring, “(GJiven the likely broad array of accounting services available in the greater Buffalo area, and the limited remaining class of BDO clientele affected by the covenant, it cannot be said that the restraint, as narrowed, would seriously impinge on the availability of accounting services in the Buffalo area from which the public may draw, or cause any significant dislocation in the market or create a monopoly in accounting services in that locale.” Id. Importantly, although the Court recognized that enforcement of such a restrictive covenant would have the effect of requiring Hirshberg’s “BDO clientele” to retain a new accountant for the 18-month restriction period, the Court did not even discuss whether this imposition would constitute injury to the public, no doubt because it believed it fell short of such an injury. See id.
Finding that all three prongs had been satisfied, the Court of Appeals held that the restrictive covenant was enforceable, as narrowed in scope by the Court, but remanded the case to the trial court for a factual finding as to whether the liquidated damage provision was grossly disproportionate to the probable loss. Id. at 395-96.
The controlling precedent in BDO Seidman makes clear that the two-year prohibition on accepting business contained within NERA’s Non-Solicitation Agreement would be enforceable under New York law if limited to Evans’s acceptance of business from NERA clients (1) whose projects he serviced, directed, or managed and (2) who were not brought with him from CERA to NERA.
As to the first prong, it is undisputed that none of the clients that Evans brought with him to LECG were clients he brought with him to NERA. His largest clients, Visa and Microsoft, came to NERA through others and ultimately became his clients. While this Court has recognized, under Massachusetts law, that the company’s goodwill and the employee’s goodwill are inevitably intertwined, New York law appears to make a cleaner cut — clients the employee brings with him to the company are part of his goodwill and clients the employee brought in and developed while working for the employer are part of the employer’s goodwill. See BDO Seidman, 93 N.Y.2d at 391-92; Johnson Controls, 323 F.Sup.2d at 535-37. Applying New York law, the United States District Court in Johnson Controls rejected the defendant’s similar argument that the clients he brought in while working for his former employer were his goodwill and not his employer’s. The Court declared;
To the extent Moon developed relationships with clients while employed by [his former employer], those relationships were financed and supported by [his former employer], which paid Moon’s salary and the salary of the other engineers that worked under him providing critical systems advice ... The Court . . . declines to read BDO Seidmarís protection of employees’ independent relationships so broadly as to find that Moon’s unique reputation with [uninterruptible power supply systems] constitutes an independent relationship, distinct from the larger client relationship financed and maintained, in large part, through [his former employer’s] efforts.
Johnson Controls, 323 F.Sup.2d at 536 (enforcing a one-year prohibition against performing services for any competitor). The same could be said of Evans — all the significant client relationships he built at NERA were financed and supported by NERA. This does not diminish Evans’s role in developing that goodwill; it simply reflects that New York law allocates the goodwill he obtained on NERA’s “dime” to NERA.
As to the second prong, the hardship imposed by the restrictive covenant in NERA’s Non-Solicitation Agreement is not significantly greater than that imposed by the Manager’s Agreement in BDO Seidman and, on two important dimensions, is far less. In both, the employee’s ability to accept work from his former clients was substantially burdened, for 18 months in BDO Seidman and for 24 months here. While the duration of the restriction is greater here, the actual hardship is much less for two reasons. First, in BDO Seidman, if Hirshberg did any work for a former client, he was required to pay liquidated damages equal to 150 percent of the fees BDO charged that client in the last fiscal year of the client’s patronage. Here, there was no liquidated damages provision, so NERA would *442 only be entitled to its actual damages from any. proven loss of patronage. Second, and more importantly, in BDO Seidman, Hirshberg was required to sign the restrictive covenant as a condition of becoming a manager at BDO. If he refused to execute the agreement, he would lose the promotion. Here, Evans was not required to sign the Non-Solicitation Agreement as a condition of his continued employment or promotion. He chose to sign it in order to exercise his M&M stock options, which added roughly $1.0 million to his already considerable regular compensation. If he believed the restriction imposed an “undue hardship” on him, he could simply have refused to exercise those options and continue to be employed at his high position. This Court does not believe that, in determining whether a restrictive covenant imposes an undue hardship, New York law is blind to the circumstances in which the employee agreed to it, specifically the freedom he had to reject it and the consideration he received for agreeing to it. See, e.g., FTI Consulting, Inc. v. Graves, 2007 U.S. Dist. LEXIS 55325 at *14-15 (S.D.N.Y. 2007) (observing that New York law routinely enforces restrictive covenants in a contract for the sale of a business but gives “more exacting scrutiny” to restrictive covenants in employment contracts); Mathias v. Jacobs, 167 F.Sup.2d 606, 610-11 (S.D.N.Y. 2001).
As to the third prong, this Court does not find that the public would be more injured by the restriction on Evans than they were by the restriction on Hirshberg approved in BDO Seidman. The restraint on Evans would not seriously impinge on the availability of economic consulting services, or cause any significant dislocation in the market, or risk a monopoly in economic consulting services. To be sure, Evans’s clients at NERA may have suffered if he were to have left NERA and adhered to the Non-Solicitation Agreement, but so, too, would have Hirshberg’s accounting clients. Indeed, one does not generally worry whether corporations the size of Visa and Microsoft have the means or ability to find other able consultants to take Evans’s place. Moreover, the restraint on Evans is far narrower in scope and less injurious to the public than a more traditional non-compete agreement, which bars the employee from working for any competitor. With the Non-Solicitation Agreement, Evans was free to leave NERA, join LECG, and immediately compete for clients against NERA, as long as they were not his former NERA clients.[2]
Having found that the two-year prohibition on accepting business contained within NERA’s Non-Solicitation Agreement is enforceable under New York law if limited to Evans’s acceptance of business from NERA clients (1) whose projects he serviced, directed, or managed and (2) who were not brought with him from CERA to NERA, the only issues that remain as to NERA’s breach of contract claim are causation and damages, since there is no dispute that Evans violated this prohibition.[3] Evans and LECG contend that NERA has failed to prove causation because there is insufficient evidence in the summary judgment record that any of Evans’s former clients would have remained with NERA after his resignation if they could not follow him to LECG. Indeed, Microsoft’s Deputy General Counsel for Litigation has submitted an affidavit attesting that, if Microsoft had been told that Evans was legally prevented from continuing to work for Microsoft, Microsoft likely would have transferred its projects anyway from NERA to another comparable consulting firm.
In determining whether the evidence in the summary judgment record as to causation is sufficient to survive summary judgment, this Court must first determine whether New York law differs from Massachusetts law in placing the burden of proof of causation on the plaintiff in non-compete cases. This Court finds that New York law indeed does differ from Massachusetts law as to the issue of causation in cases alleging breach of a restrictive covenant by an employee. Under New York law, to prove “the contractual damages of breach of the noncompetition obligation, an employer must prove its own loss of profits, not what the employee’s profits were.” Gomez v. Bicknell, 302 A.D.2d 107, 114, 756 N.Y.S.2d 209, 214 (App.Div.2nd Dept. 2002). See also Borne Chemical Co., Inc. v. Dictrow, 85 A.D.2d 646, 650, 445 N.Y.S.2d 406, 413 (App.Div.2nd Dept. 1981) (“In order to recover substantial damages for breach of the contracts in question, the plaintiff has the burden of proving that it sustained a net loss of profits as the result of the wrongful competition of the defendants”). The threshold for initially meeting this burden is rather modest— "proof of competition in violation of the contract between the parties and a loss of profits with the onset of that competition will be sufficient to warrant an award of damages." Borne Chemical Co., Inc. v. Dictrow, 85 A.D.2d at 650, 445 N.Y.S.2d at 413. As understood by at least one New York trial court judge, “the common sense approach” in Borne Chemical means that if the plaintiff “does show a decrease in his net profits during the period of unlawful competition, a rebuttable presumption arises that the competition was the cause of the decrease, so that it is not necessary for the [plaintiff] to negate other possible causes.” PNY Realty Corp. v. Chong Leung Restaurant, 116 Misc.2d 1035, 1041, 457 N.Y.S.2d 358, 362 (Civil Court, Bronx County 1982). In explaining this modest burden, the Appellate Division in Borne Chemical stated, “[TJhere is no reason why courts should put a premium on bad faith by requiring the injured party to name each particular person who has been induced to pass his store for the purpose of trading with the intruding competitor.” Borne Chemical Co., Inc. v. Dictrow, 85 A.D.2d at 650, 445 N.Y.S.2d at 413, quoting Dethlefs v. Tamsen, 7 Daly 354, 360.
Once the plaintiff meets that burden of proof by a preponderance of the evidence, the defendant may rebut that presumption by introducing evidence that *443 the plaintiffs net profits would have been less regardless of the plaintiffs competition, for instance, because of a recession or an unrelated increase in cost. Borne Chemical Co., Inc., 85 A.D.2d at 651, 445 N.Y.S.2d at 414. If the defendant meets his burden, the plaintiff must then prove by a preponderance of the evidence “the proportion of the loss of profits attributable to the wrongful act of the defendant and recoverable as damages as opposed to the proportion due to other causes.” Id.
It is not clear from the New York case law whether the defendant’s burden is simply a burden to produce some evidence to rebut the presumption that the entirety of the loss of net profits was caused by the defendant’s competition or a burden of proving that the entirely of the loss of net profits was not caused by the defendant’s competition. This Court infers that the defendant’s burden is a burden of proof, not simply of production, because it is clear from Borne Chemical that, once the defendant meets his burden, the burden of proof shifts back to the plaintiff to prove “the proportion of the loss of profits attributable to the wrongful act of the defendant and recoverable as damages as opposed to the proportion due to other causes.” Id. This description of the plaintiffs burden implies that the defendant has already proven by a preponderance of the evidence that not all of the loss in net profits was caused by the defendant’s competition, because the plaintiffs shifted burden is now focused only on the percentage of lost profits caused by the defendant’s competition.
Here, viewing the evidence in the light most favorable to NERA, as this Court must in considering Evans’s motion for summary judgment, NERA has more than sufficient evidence to prove that it suffered a net loss of profits during the period that Evans provided consulting services for former NERA clients, especially Visa and Microsoft. Meeting that burden may not be sufficient to allow NERA to prove causation and damages at trial, but it is sufficient to allow NERA to survive amotion for summaiyjudgment. Evans may very well be able to prove at trial that NERA’s loss of net profits were not entirely caused by his competition but, on this summaiyjudgment record, there are facts in dispute on this issue, as well as on the issue of the proportion of loss attributable to Evans’s competition.
This Court further finds that there are issues of disputed fact as to whether Evans violated the Non-Solicitation Agreement by soliciting NERA employees who reported to him directly or indirectly to terminate their employment at NERA to join him at LECG to compete against NERA. Viewing the evidence in the light most favorable to NERA, NERA has produced sufficient evidence to prove that it suffered a net loss of profits during the period that the employees allegedly solicited by him worked with Evans at LECG. As with the alleged solicitation of clients, since there is evidence that NERA may prove this rebuttable presumption, NERA survives summaiyjudgment on this part of its breach of contract claim as well. Therefore, Evans’s motion for summaiy judgment as to NERA’s breach of contract claim is denied.
As the parties contemplate how to apply New York law to this causation issue at trial, this Court observes that, ultimately, NERA will likely need to prove that the former NERA clients which followed Evans to LECG would have continued to retain NERA to provide consulting services if Evans had resigned from NERA but adhered to his Non-Solicitation Agreement. Evans had no contractual obligation to remain employed at NERA; he was free to leave at will. Therefore, in seeking to prove that Evans’s breach of the Non-Solicitation Agreement caused NERA to suffer a net loss in profits, it would not be enough for NERA to prove that Visa and/or Microsoft would have remained NERA clients had Evans remained with NERA. Rather, to meet its burden, NERA effectively will need to prove that Visa and/or Microsoft would have remained NERA clients if Evans had left NERA but adhered to his contractual obligation not to solicit clients or employees.
Tortious Interference with Contractual Relations
NERA’s claim of tortious interference with contractual relations, as the name implies, sounds in tort, not in contract, so the provision in the Non-Solicitation Agreement declaring that “[t]his agreement shall be construed in accordance with the laws of the State of New York” does not apply. Rather, as to this claim, the governing law is the more familiar turf of Massachusetts common law.
“In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991), citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-17 (1990). Here, there is abundant evidence, if viewed in the light most favorable to NERA, that Evans had a Non-Solicitation Agreement with NERA, that LECG knowingly induced Evans to breach that Agreement, and that NERA was harmed by the breach that occurred. The question, then, is whether there is any evidence that LECG’s inducement was “improper in motive or means.”
The improper motive required to prove tortious • interference is actual malice — "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." King v. Driscoll, 418 Mass. 576, 587 (1994), quoting Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992), which quotes Sereni v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 428, 433. See also Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). “The motivation of personal gain, *444 including financial gain, . . . generally is not enough to satisfy the improper interference requirement.” King v. Driscoll, 418 Mass. at 587. Nor is “personal dislike” enough to prove an improper motive. Id. “Generally, the propriety of the [defendant’s] motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis.” Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. 101, 105 (1995), rev. denied, 423 Mass. 1111 (1996). Here, there is no evidence that LECG acted with any spiteful, malignant purpose unrelated to the legitimate purpose of profiting by wooing away from NERA a consultant with a formidable group of clients who could strengthen LECG’s bottom line. This, without more, is insufficient to establish improper motive, and there is nothing more in the summary judgment record.
The improper means required to prove tortious interference must consist of a violation of a statute or the commission of a common law tort (or aiding and abetting its commission), such as threats, misrepresentations, or defamation. United Truck Leasing Corp. v. Geltman, 406 Mass. at 817; Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998). Since improper means (or, alternatively, improper motive) constitutes a separate and distinct element from inducement of a breach, it must mean something more than mere inducement itself. Here, the only improper means alleged against LECG is its agreement to indemnify Evans for the costs of defending any claim that NERA or M&M may make against him, and for any judgment or settlement arising from such a claim. The execution of such an Indemnification Agreement violates no law and commits no tort. It may, of course, help to induce a breach of contract because it eliminates (or considerably diminishes) the financial risk that Evans would face from a lawsuit such as this, but mere inducement of a breach of contract, standing alone, is not enough to establish a tortious interference claim.[4]
Since the summary judgment records contains no evidence that, even generously construed, could support a finding of improper motive or improper means, LECG’s motion for summary judgment as to the claim of tortious interference with contractual relations is allowed.
Breach of Fiduciary Duly
NERA’s claim of a breach of fiduciary duty also sounds in tort, and therefore is governed by Massachusetts law. In Augat, Inc. v. Aegis, Inc., the Supreme Judicial Court set forth the parameters as to when an employee planning to go into competition with his employer breaches his fiduciary duty to his employer:
An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed . . . Such an employee has no general duty to disclose his plans to his employer, and generally he may secretly join other employees in the endeavor without violating any duty to his employer . . . The general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged . . . There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer’s trade secrets ... He may not solicit his employer’s customers while still working for his employer..., and he may not carry away certain information, such as lists of customers ... Of course, such a person may not act for his future interests at the expense of his employer by using the employer’s funds or employees for personal gain or by a course of conduct designed to hurt the employer.
409 Mass. 165, 172-73 (1991). When an employee has executed an enforceable non-compete agreement with his current employer, the “active steps” an employee may take to prepare for competition may constitute a prelude to a breach of that non-compete agreement but they do not constitute a breach of fiduciary duty. Consequently, the line that divides permissible preparation from a breach of fiduciary duty is the same for an employee regardless of whether or not he has entered into a non-compete agreement.
Here, there is no evidence that Evans appropriated any of NERA’s trade secrets or that he solicited any clients to come with him to LECG while still employed at NERA. There is, however, evidence that NERA customer lists were given to LECG, albeit not by Evans. Melba Largent, who worked for Evans at NERA and joined him when he left for LECG, testified that she brought with her a list of potential antitrust customers that contained contact information for roughly 2,500 persons, which was later used to send LECG marketing materials to these clients. However, she also testified that she took the list without Evans’s knowledge or approval. Indeed, there is no evidence that Evans directed anyone to bring a copy of this list to LECG. There is also no evidence that NERA ever adopted a policy that such contact lists were to be treated as the property of NERA or otherwise advised its employees that the lists were NERA property. Consequently, since NERA has failed to proffer evidence that customer lists were to be treated as confidential NERA property or that Evans caused the antitrust list to be transmitted to LECG, NERA cannot prevail on its breach of fiduciary claim based solely on the dissemination of this list to LECG.
NERA also contends that Evans, while still employed at NERA, used NERA funds to plan his departure, but the misuse of funds alleged is de minimis. Specifically, NERA complains that Evans charged or sought reimbursement for certain telephone calls that he made while negotiating his departure for LECG. To be sure, this was a mistake by Evans, but since the improper telephone charges amounted to less than $25, the mistake falls well short of a breach of fidu- *445 ciaiy duty. NERA also complains that he used his NERA-issued laptop to communicate with LECG. This, too, falls well short of a breach of fiduciary duty, especially since NERA expressly permitted its employees to use its Internet resources for personal use. Indeed, if an employee’s occasional use of an employer’s telephone or laptop to further the employee’s plan to compete against his current employer were sufficient to support a breach of fiduciary claim, then the conditional freedom to compete articulated by the Supreme Judicial Court in Augat would be effectively dead letter doctrine, because virtually every employee planning to compete is likely, at least a little, to go astray in this regard.
For these reasons, Evans’s motion for summary judgment as to NERA’s breach of fiduciary duty claim must be allowed.
Misappropriation of Corporate Opportunity
Under Massachusetts law, “[a] person who owes a fiduciary duty to a corporation is prohibited from taking, for personal benefit, an opportunity or advantage that belongs to the corporation.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 529 (1997). NERA contends that the corporate opportunity that Evans usurped while still an officer of NERA was his own employment and the “goodwill” of the antitrust practice he built at NERA. This contention, while admittedly clever, is fundamentally unsound and incompatible with long-standing legal doctrine protecting an employee’s right to compete against his former employer.
One’s own employment, even one’s practice group, is not a corporate opportunity under the corporate opportunity doctrine. The essence of the corporate opportunity doctrine is that a fiduciary of a corporation who learns of a business opportunity that he reasonably should expect would be of interest to the corporation cannot take that opportunity for his own personal profit but must instead first offer that opportunity to the corporation. Id. at 530, citing with approval Principles of Corporate Governance §5.05(b)(l) (1994). If one’s own employment were to be considered a corporate opportunity, then no officer of a corporation would be free to leave his employment unless he first offered “the opportunity” of his services to his current employer and his employer rejected the opportunity. See Demoulas at 530 (“A director or officer is not entirely barred from pursuing a corporate opportunity, but a person holding either position cannot do so unless the opportunity is first offered to the corporation and rejected by it. In this aspect, the corporate opportunity doctrine may be considered to be a rule of disclosure.”). For those officers employed at-will, this would transform their employment relationship, effectively denying them the ability to leave their jobs unless the employer chose to release them.
NERA counters that Evans, although at-will, had executed a non-compete agreement, so the “corporate opportunity” that LECG and Evans usurped was NERA’s right to be free for two years from Evans’s solicitation and servicing of his former NERA clients. This characterization makes no sense under corporate opportunity doctrine, because Evans could not reasonably be obliged to offer NERA his non-solicitation of these clients, since NERA already was entitled to his non-solicitation through its Non-Solicitation Agreement. The fact of the matter is that a restrictive covenant needs to be evaluated through the common-law principles that have limited the enforcement of such restrictions on competition. Mischaracterizing a corporation’s contractual entitlement as a corporate opportunity and attempting to overlay corporate opportunity doctrine onto the doctrine governing restrictive covenants is a recipe for confusion. In short, neither Evans’s own employment nor his practice group can fairly be characterized as a corporate opportunity so he cannot justly be found to have misappropriated a corporate opportunity by changing his employer. As a result, Evans’s motion for summaiy judgment as to NERA’s misappropriation of corporate opportunity claim must be allowed.
Chapter 93A Claim
NERA has brought a claim under G.L.c. 93A, §11 against LECG, contending that LECG may be liable under Chapter 93A for inducing Evans’s wrongful acts even though the Chapter 93A claim could not be brought against Evans himself.
The violation of a non-compete agreement by a former employee falls outside the scope of G.L.c. 93A, § 11 regardless of whether that violation occurs during or after the employment relationship, because disputes arising from employment agreements are not in “trade” or “commerce." Informix, Inc. v. Rennell, 41 Mass.App.Ct. 161, 162-63 (1996). As the Appeals Court declared in Informix.
Employment agreements between an employee and his employer do not constitute either “trade” or “commerce.” “(D)isputes arising from an employment relationship between an employee and the organization that employs him . . . are not covered by the c. 93A remedies afforded in commercial transactions ... Contract disputes between an employer and an employee . . . are principally ‘private in nature’ and do not occur in the ordinary ‘conduct of any trade or business’ as contemplated by the statute.”
Id. at 163, quoting Manning v. Zuckerman, 388 Mass. 8, 14 (1983). See also Second Boston Corp. v. Smith, 377 Mass. 918 (1979) (claims by an employer against his employee for breach of duty as an employee are not within the scope of G.L.c. 93A). NERA, however, properly observes that, in Augat, the Supreme Judicial Court found that a corporation that aided and abetted a breach of an employee’s fiduciary duty may be liable to his former employer under Chapter 93A even if the employee himself could not be. Augat, 409 Mass. at *446 172. See also Hanover Insurance Co. v. Sutton, 46 Mass.App.Ct. 153, 174 (1999). If NERA had presented evidence sufficient to support a finding that LECG induced Evans to commit a breach of fiduciary duly or had the improper motive or means sufficient to support a tortious interference claim, then NERA indeed would have a viable Chapter 93A claim against LECG. As has already been discussed, though, NERA has failed to present evidence to support such a finding.
Consequently, NERA’s Chapter 93A claim must rest on its evidence that LECG induced Evans to violate his Non-Solicitation Agreement with NERA by recruiting him to come, paying him handsomely, and indemnifying him for his attorneys fees and any possible judgment in this litigation. This alleged conduct, in the absence of improper motive or means, is neither deceptive nor unfair under G.L.c. 93A, §2. The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed.Reg. 8325, 8355 (1964). Inducement of a breach of an employment agreement alone, without improper motive or means, falls short of this standard. Indeed, freedom of competition in employment would be substantially restrained if conduct that was insufficient to support a claim of tortious interference with contract were deemed sufficient to support a Chapter 93A claim, with its additional remedies of punitive damages and the award of attorneys fees. As this Court declared in another case:
Courts have wisely interpreted the legislative intent in enacting c. 93A to exclude disputes arising out of the employment relationship, and that wisdom is clearly seen with respect to the enforcement of non-compete agreements. See Manning v. Zuckerman, 388 Mass. at 12-13. In determining whether to enforce such non-compete agreements, Massachusetts courts have carefully sought to balance the reasonable needs of the employer for protection against harmful conduct by a former employee with the reasonableness of the restraint imposed on the former employee and the public interest in promoting competition. See All Stainless, Inc. v. Colby, 364 Mass. 773, 778-81 (1974). Courts will enforce such agreements only when they have a legitimate business purpose and are reasonable in time, space, and scope, based on all the circumstances. See id. As a result, a prospective employer who is seeking to hire an employee burdened by a non-compete agreement may not be certain whether that agreement is enforceable until the matter is litigated. If c. 93A applied to these disputes, with its provision for treble damages and the allowance of attorneys fees, the delicate, uncertain balance that presently applies to these cases would be dramatically altered. A competitor who is contemplating hiring an employee with a non-compete agreement may find the financial risk of litigation so great that such employees may effectively be unable to find work in their field, regardless of the reasonableness of their non-compete agreement.
Intertek Testing Servs. NA, Inc. v. Curtis-Strauss LLC, No. 98-903-F, 2000 Mass. Super. LEXIS 354 at *33-37 (Mass.SuperCt. Aug. 7, 2000).
Consequently, LECG’s motion for summary judgment as to NERA’s claim under G.L.c. 93A, §11 is allowed.
ORDER
For the reasons stated above, this Court ORDERS that:
1. Evans’s motion for summary judgment as to NERA’s breach of contract claim is DENIED.
2. The defendants’ motion for summary judgment as to NERA’s remaining claims is ALLOWED.

In August 1989, Evans resigned his tenured faculty position at Fordham but he continued to teach a course in law and economics at Fordham Law School until 1995.

This Court recognizes that, applying New York law, it earlier showed far greater concern with the dislocation imposed upon clients who would suddenly need to find a new financial advisor if the prohibition on accepting business from former clients were enforced. See Smith Barney Div. v. Griffin, 23 Mass. L. Rptr. No. 20, 457 at 459 (February 18, 2008) (Gants, J.) (“the enforcement of the confidentiality and non-solicitation provisions punishes the clients of the departing financial advisors, many of whom have relied upon the advice of their financial advisor for many years in deciding how to invest their life savings”). There are at least two significant differences between Smith Barney and the instant case. First, Griffin was required to execute the non-solicitation agreement as a condition of her employment and received no consideration apart from her continued employment. Evans was not required to execute his Non-Solicitation Agreement and did so only to receive the substantial additional consideration he obtained from the exercise of his M&M stock options. Second, the issue in Smith Barney was not whether the non-solicitation agreement was enforceable but whether to allow a motion for preliminary inj unction that would have barred Griffin from servicing her former investment clients. Here, since NERA did not seek preliminary injunctive relief, the issue is not whether Visa, Microsoft, or Evans’s other clients should be denied his consulting services but whether LECG will pay NERA for any profits it lost as a result of Evans’s breach.

In so finding, this Court also renders moot the dispute as to whether Evans solicited the business of his clients, since his doing so would have caused financial injury to NERA only if he had accepted the business that he solicited.

NERA cites the Supreme Judicial Court case of National Merchandising Corp. v. Leyden, 370 Mass. 425, 429-30 (1976), for the apparent proposition that inducement alone is sufficient to establish a tortious interference. That case, however, did not involve a tortious interference but rather the inducement of the breach of an injunction issued through a consent decree. Consequently, it is wholly inapposite to the claim before this Court.